Filed 4/30/13  P. v. Brown CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B238095 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA342512) |
| v. | |
| KEVIN ANTARIO BROWN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.
Michael E. Pastor, Judge.  Affirmed in part and reversed in part with directions.

Edi M. O. Faal; and Peter Gold for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kevin Brown, a physician, appeals from the judgment entered following a jury trial in which he was convicted on 23 counts of committing sex offenses against nine female patients. He contends insufficient evidence supported several of the convictions, the judgment must be reversed due to instructional and evidentiary errors and prosecutorial misconduct, and two counts were time barred. We conclude two counts were time barred and reverse as to them, but otherwise affirm the judgment.

## BACKGROUND

### I. FACTS

#### A. Dominique H., June 2007

Defendant was a physician practicing in Los Angeles at both a weight loss clinic and medical offices. In June 2007, Dominique H., age 19, who was feeling weak and tired, appeared for an appointment with defendant, her primary care physician, at his medical offices to have her blood checked for anemia. After checking in and having a nurse measure her height and weight, Dominique was taken to an examination room. When defendant arrived, Dominique told him her symptoms and he began to examine her. During the examination, defendant raised Dominique's shirt, exposing her bra. He began to caress her breast through the bra, then lifted the bra above her breasts and began pressing on her breast with three fingers in the nature of a breast exam. The touching then changed to a caressing motion, and defendant told Dominique the boys would be all over her and she was going to get them into trouble because of her belly button piercing. He also asked her if she had ever been with an older man. She said no. Defendant then opened Dominique's pants and put his hand down them and asked if she could keep a secret, his hand reaching far enough for his middle finger to reach the crease of her labia. When she asked what did he mean, he said he knew she couldn't keep a secret, and withdrew his hand, ending the examination. He then left the room. No one else was in the room during the examination, and the door was closed.

Dominique dressed, walked to the front desk to obtain a receipt for her $10 copayment, and left. She reported the incident to police the next day.

2

**B.      Stacey Y., June 2008**

In June 2008, Los Angeles Police Detective Monica Cross arranged for an undercover police officer to see defendant as a fictitious patient. The officer, Stacey Y., was outfitted with surveillance equipment and sent to defendant's medical offices posing as a patient. Stacey Y. had an actual ankle injury, and decided to use it as the pretext for the appointment.

After a nurse took her blood pressure, Stacey Y. was taken to an examination room. Defendant entered the room, introduced himself, asked about her injury, and examined her ankle. When Stacey Y. told defendant she had been feeling tired lately, he checked her ears, face, eyes and mouth. He told her to look over his shoulder, then lifted her shirt and bra and put his hand on her left breast and nipple. Stacey Y. pushed defendant away and put her shirt down, and he said, "'I'm sorry. I'm sorry. I was trying to check your stomach.'" He then placed a stethoscope on her back and resumed the examination. Stacey Y. left the examination room shortly thereafter and made a follow-up appointment. Later that evening she was emotionally distraught, and decided not to keep that appointment.

**C.      Defendant's Arrest**

In July 2008, Los Angeles Police arrested defendant and held a televised press conference in which they asked additional victims to come forward. As a result of this and subsequent media coverage about the case, several did so.

**D.      Anita H., December 2005**

When Anita H. learned that defendant had been arrested and the police were requesting that victims come forward, she phoned police and was interviewed. At trial, Anita testified that in December 2005, when she was 19 years old, she visited defendant's medical offices for treatment of a severe cold. She had a headache, watery eyes, a sore throat, and a bad cough, and she felt weak. When defendant entered the examination room, he listened to Anita describe her symptoms and checked her breathing with a stethoscope. Then without further examination or comment, defendant lifted Anita's shirt and bra over her breasts, exposing them. He touched her breasts and squeezed them

3

with his whole hand, then lowered her bra and shirt. When she asked what handling her breasts had to do with an examination for a cold, defendant gave no responsive answer, but instead discussed her cold again and prescribed some medication. Defendant gave Anita a gown, instructed her to remove her clothing from the waist down, and left. When he returned, he told Anita he was going to perform a pap smear, and proceeded to do so. Although defendant used a speculum, a swab and gel to perform the pap smear, he also inserted two or three fingers into her vagina and was "feeling around" in a manner not typically employed in a pelvic examination.

Anita H. did not fill the prescription defendant gave her and, feeling unsafe, never returned to his medical offices. When asked why she made no objection to defendant's examination at the time, Anita testified, "At the time, I wasn't feeling good. I didn't know for sure when I was there until actually after the visit and I walked out of the doctor's office. Like I said, I wasn't feeling good at the time. So that wasn't the first thing in my mind to think that someone is doing something wrong to you."

### E.     Erica E., December 2005

Erica E. also heard on the news that defendant had been arrested. In December 2005, she had visited defendant's medical offices, presenting with a respiratory infection. After reading her medical chart, defendant inquired about a lump or knot on her chest, between her breasts, that she had reported to another doctor on an earlier visit. He asked her to remove her shirt, which she did, leaving her bra on. When her shirt was off, defendant grabbed her in an embrace and put his face in her chest. He pulled her bra down, exposing her breasts, and kissed and sucked on them. Defendant tried to put his hand down Erica's pants, but they were too tight. Erica eventually pushed him away, whereupon defendant went to the sink and washed his hands. He told her, "We can't tell anybody. This shouldn't have happened." He blamed the assault on her perfume, saying she should not have worn it. Then he left the room.

### F.     A.G., October 2006

A.G. visited defendant's medical offices in October 2006, when she was 15 years old. She told defendant she had a painful lump on her upper right breast. Defendant

4

examined that breast, but then, without speaking, grabbed and squeezed and caressed her other breast with his full hand and played with the nipple.

### G.    Tina S.

Tina S. consulted with defendant from 2003 to 2006. Some time before 2006, when Tina sought treatment for a bladder infection, defendant slapped her buttocks. At a later visit she sought medication for depression. Defendant told her that because she had had her breasts augmented, he had to check them for lumps. He then examined her breasts in a different manner than she had experienced with other doctors. He rubbed and caressed her breasts in a circular motion around the areola, pressed on them from the sides, and touched her nipples. Tina did not know in what year these events occurred.

In September 2006, Tina again appeared at defendant's medical offices, again seeking only to pick up medication. When she was seated on an OB-GYN table wearing only a medical gown, defendant inserted a speculum or his fingers into her vagina without need or authorization, held her down and tried to force his penis into her vagina.

### H.    Tanesha N., January 2008

Tanesha N. visited defendant's weight loss clinic in January 2008. As she lay on an examining table, defendant, with no warning or explanation, lifted her breasts out of her blouse and over the top of her bra and started squeezing her nipples and rubbing her breasts. He asked if she was lactating. He then sat in a chair and called her to stand in front of him. When she did, he told her, "Well, you know, you are beautiful to me." He laid his head against her breast and told her it would not cost her anything to continue in his weight loss program.

### I.    L.N., March 2008

L.N. saw defendant at his weight loss clinic in March 2008. Defendant told her he wanted to give her a mammogram, but the examination room contained no mammogram machine. Defendant then lifted L.N.'s shirt and bra over her breasts and started "fumbling" with her breasts. With arms outstretched and palms facing L.N., defendant, moaning, rubbed both breasts, including the nipples and areolae, in a circular motion. While palming L.N.'s breasts he asked if she was single. The contact lasted for

approximately one minute. L.N. pulled her shirt down (but did not replace her bra) and ran out of the clinic. The next day, L.N. asked defendant's receiving nurse whether a mammogram was part of the weight loss protocol. She responded it was not.

### J.    Carla K., April 2008

In April 2008, Carla K. visited defendant's medical offices to obtain reauthorization for an annual CAT scan. In an examination room, as she laid down on the examination table, defendant pulled her sweater up to her bra and began palpitating her stomach. He then had her sit up and told her he was going to listen to her heart. He pulled her sweater up to her chin, exposing her bra, and listened to her heart with a stethoscope. Suddenly, defendant grabbed her bra and lifted it over her breasts, exposing them, then grabbed her left breast and said, "You have beautiful breasts." Carla K. testified, "It was so fast. I mean, the second he put my bra up, he just grabbed my breast. And I looked down at his hand, and I looked up at him. And I said, what is this? So then he took his hand away."

Defendant then asked Carla to stand before him and asked if she had had any surgeries. She replied that she had had two lower back surgeries. Defendant asked, "Oh, well, can I look?" Before she could answer, he put his hands on her waist and turned her around, unzipped her skirt, which dropped to the floor, and grabbed her panty hose and panties and stripped them to her ankles. Carla testified, "All his movements were very fast and caught me off guard because he was a stranger to me. [¶] . . . [¶] [H]e was just so fast with everything. He grabbed my panty hose and my panties. And in an instant, they are around my ankles." Defendant proceeded to caress Carla's buttocks, complimenting her body, then turned her back toward him and put his hand on her inner thigh and drew it up until he was touching her clitoris. Carla testified, "And he, he was kind of at my breast level sitting in front of me, and he cocked his head. And he looked up at me almost like a high school boy. And he giggled." Defendant told Carla she would have to find another doctor because he wanted a relationship with her. He told her he was going through a separation, and she was the most interesting woman he had met.

6

Carla dressed as fast as she could, including pulling her sweater and bra down. When she was dressed, defendant asked, "Can I look again?" Carla testified, "And bam, he has in one fell swoop grabbed my sweater, grabbed my bra. And it's again jerked up to my chest which is painful. [¶] And I immediately just pull my bra down."

## II.    PROSECUTION AND TRIAL

The Los Angeles County District Attorney filed an information against defendant on August 2, 2008. As amended, the information charged defendant with 33 sex offenses against 12 female victims. The charges included sexual battery by fraud (Pen. Code, § 243.4, subd. (c); counts 1, 6, 8, 14, 18, 19, 26, 30, 32);[1] sexual exploitation by a physician (Bus. & Prof. Code, § 729, subd. (a); counts 3, 7, 9, 15, 18, 20, 27, 31, 33); attempted sexual battery of Officer Stacey Y. (count 2); a lewd and lascivious act committed against A.G. (§ 288, subd. (c)(1); count 5); forcible rape and sexual penetration of Carla K. by a foreign object (§§ 261, subd. (a)(2) and 289, subd. (a)(1); counts 16 and 17); sexual penetration of Randi S. by a foreign object (§ 289, subd. (d); count 21); and two acts of forcible sexual penetration of Tina S. (§ 289, subds. (a)(1) and (d); counts 24 and 25). As to each count of sexual exploitation by a physician, the information alleged defendant engaged in acts of sexual conduct with two or more patients within the meaning of Business and Professions Code section 729, subdivision (b)(3). And as to the rape and sexual penetration of Carla K. and sexual penetration of Tina S., it was alleged defendant committed the offenses against more than one victim within the meaning of section 677, subdivision (b). Defendant pleaded not guilty to all counts and denied the special allegations.

Trial by jury commenced on July 21, 2011. During trial, the court granted the prosecution's motion to dismiss counts 10 through 13 in furtherance of justice. (§ 1385.) The jury found defendant guilty on all counts of sexual battery by fraud and sexual exploitation by a physician, the count of lewd and lascivious conduct against A.G., the counts of sexual penetration of Randi S. and Tina S. by a foreign object, and the

---

[1] Undesignated statutory references are to the Penal Code.

7

attempted sexual battery of Officer Stacey Y.  It found true the special allegations associated with counts 3, 7, 9, 15, 18, 20, 27, 31 and 33; found not true the special allegation associated with count 24; and deadlocked on counts 4, 16-17, 21-23, and 28-29.  The trial court sentenced defendant to a prison term of 12 years 6 months and granted the prosecution's motion to dismiss counts 4, 16-17, 21-23, and 28-29 in the interest of justice and subject to the continuing validity of the convictions and sentence on the other counts.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I.  SUFFICIENCY OF EVIDENCE

#### A.  Inherent Improbability or Impossibility

Defendant's first contention on appeal is that the judgment must be reversed as to the crimes against Dominique H., Stacey Y., A.G., Carla K., and Tina S. because their testimony was inherently improbable.  He asserts that the circumstances in which the allegations arose and certain purported discrepancies between the allegations and other evidence demonstrate such improbability.

In reviewing a sufficiency of the evidence claim we examine the entire record in the light most favorable to the judgment and determine whether the evidence is of such solid value that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)  We presume the existence of every fact that could reasonably be deduced from the evidence (*ibid*.), and will reverse only if it appears that under no hypothesis does sufficient substantial evidence support the conviction (*People v. Hughes* (2002) 27 Cal.4th 287, 370).  If circumstances reasonably justify the jury's findings, we may not reverse the judgment merely because we believe the circumstances might also support a contrary finding.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

The inherently improbable standard addresses whether the events described could have occurred, not whether the witness is credible.  (*People v. Mayberry* (1975) 15 Cal.3d 143, 150.)  "The standard for rejecting a witness's statements on this ground

8

requires "'"either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.'"" [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 124.) The challenged evidence must be "improbable on its face." (*People v. Headlee* (1941) 18 Cal.2d 266, 267 (Headlee).) "To be improbable on its face the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed. The improbability must be apparent; evidence which is unusual or inconsistent is not necessarily improbable." (*Ibid.*) We do not compare allegedly improbable evidence to other evidence. The only question is whether it is possible the events described by the witness actually happened. (*People v. Mayberry*, *supra*, 15 Cal.3d at p. 150.) Therefore, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People v. Huston* (1943) 21 Cal.2d 690, 693.) "Testimony may be rejected only when it is inherently improbable or incredible, i.e., "'unbelievable *per se*,'" physically impossible or "'wholly unacceptable to reasonable minds.'"" (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065; *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261 ["Such cases are rare indeed."]; *People v. Resendez* (1968) 260 Cal.App.2d 1, 8.)

Defendant does not claim it would have been impossible for him to have sexually assaulted Dominique H., Stacey Y., A.G., Carla K., or Tina S., but suggests the jury, as a matter of law, should have inferred or deduced from the circumstances surrounding each patient's visit to his medical offices that each of these victims was lying. This is just the sort of "inferences and deductions" argument the courts have repeatedly rejected.

### 1. Dominique H.

Defendant was convicted in counts 1 and 3 of sexual battery on Dominique H. and sexual exploitation by a physician. Dominique testified defendant caressed her breast through her bra, lifted the bra above her breasts and continued to caress them, opened her pants and put his hand down them to finger her labia. Defendant argues discrepancies

9

between Dominique's testimony and an office video recording of her behavior after she left defendant's examination room demonstrate her allegations of sexual battery were inherently improbable. Specifically, defendant contends that although Dominique testified she "quickly left the office without waiting and started to cry after leaving," the office video shows she "had the same normal and calm composure after the alleged incident as she had before it," loitering at the reception desk while "nonchalantly texting" and sometimes "laughing or smiling." Defendant argues Dominique had no reason to wait at the reception desk, as her transaction had been completed before she was examined. Because Dominique's actions as shown on the office video recording "were so completely contrary to what a victim of sexual assault would have done under the circumstances," he argues, her "allegations" against him must be rejected as inherently improbable. Defendant makes a similar argument, *post*, with respect to Carla K., whose "testimony implicating [him] in a series of sexual assaults," he argues, "must be rejected as inherently improbable" because her actions after defendant assaulted her were "completely contrary to the normal, ordinary conduct of a victim of such sexual assaults.

We have viewed the recording, which was played for the jury. In a low-resolution picture with no sound, it shows a young woman we presume to be Dominique arriving at a medical office at timestamp 11:19 a.m. on June 28, 2007. She appears to give a credit card to the receptionist, who processes it and gives it back. The receptionist does not appear to give Dominique a receipt. Dominique then sits in the waiting room until she is called to the examination room at 11:33. Dominique returns from her examination at 11:54 and stands at the reception counter for six minutes. While there, she appears to text on her cell phone, and at one point seems to smile, perhaps even laugh, although the video resolution is too grainy to be certain.

At the outset, defendant's argument that Dominique's post-assault demeanor was incompatible with her allegations is incognizable on appeal. The jury found her claims to be credible despite the purported weaknesses he now cites, and we cannot second-guess that determination.

10

A party in *In re S.A.* (2010) 182 Cal.App.4th 1128, a dependency proceeding, made a similar argument. There, the minor's adoptive father argued the minor's allegations against him of sexual abuse were inherently unreliable because there were "discrepancies in the evidence as to exactly when the sexual abuse began and ended, where it occurred, and its frequency." (*Id.* at p. 1149.) He also argued the minor's testimony was implausible because, for instance, she kept a diary in which she related some of her sexual activity but did not write that he had sexually abused her; she was happy to have him adopt her; she had earlier recanted allegations of abuse made to a social worker and police officers; and her physicians never saw any sign of abuse. (*Ibid.*) The father also argued that because the minor had been sexually abused in the past by others, her "acting out" could not possibly be attributed to any sexual abuse by him. The court held that none of these matters suggested the minor's testimony or other evidence supporting the court's ruling was inherently improbable. The matters did not show any physical impossibility, apparent falsity or extreme outlandishness. Rather, inconsistencies and conflicts in the evidence went to the credibility of witnesses and weight of the evidence, which were matters for the trial court. The court wrote, "Under the guise of inherent improbability, [father] invites us to usurp the juvenile court's factfinding role, which we decline to do." (*Id.* at pp. 1149-1150.)

Further, we reject the proposition that there exists some metric by which "normal" and "ordinary" post-assault behavior can be defined as a matter of law. Defendant cites no authority for such a proposition and we are aware of none. We cannot determine from the recording whether Dominique was calm or nonchalant, or whether she laughed or smiled, but assuming she was calm and did laugh, such behavior would not "do violence to reason, challenge credulity, and in the light of human experience, emasculate every known propensity and passion of people under the conditions testified to by" the victim. (*People v. Carvalho* (1952) 112 Cal.App.2d 482, 489 ["fantastic" testimony does not constitute substantial evidence sufficient to support a conviction] (*Carvalho*).) The range of human reaction to psychological trauma caused by an assault is wide. It may begin with uncertainty and disbelief (especially when assault occurs during a medical

11

examination) and include within its scope outward calm, smiling, or even laughter. It was for the jury to determine whether to believe Dominique was as traumatized as she claimed, and to infer whether her post-examination demeanor undermined her claim that defendant had assaulted her. Nothing presented in Dominique's testimony or the video recording permits us to conclude as a matter of law that the attack did not occur. Even if Dominique's calm composure, nonchalance, laughing or smiling constituted unusual post-assault behavior, we would be unable to conclude the behavior was so abnormal as to render her allegations of sexual assault inherently improbable.

Even if we were to second guess the jury under some sense of what constitutes "normal" post-assault behavior, nothing about Dominique's post-visit conduct, as depicted in the video recording, was inconsistent with her testimony. Dominique testified she was "more nervous than upset" after defendant assaulted her, and she quickly buttoned up her pants and left the examination room. She stopped at the receptionist window to get the receipt for her co-payment of $10 but did not obtain fliers she had previously agreed to distribute for defendant. Dominique testified it took "[l]ike a minute or two" to print the receipt, after which she left the clinic. She did not start crying until after she left. The video recording shows Dominique leaving the examination room and waiting at the reception desk for six minutes, presumably to obtain the receipt that she had not received earlier.

In a sex abuse case, "because of the nature of the charged acts, it is seldom that direct corroborating evidence can be produced by either side, and the case must usually rise or fall on the credibility of the prosecuting witness and of the accused. That is peculiarly a jury question." (*People v. Goldberg* (1952) 110 Cal.App.2d 17, 22.) The jury saw Dominique H. and saw the video recording. Dominique's testimony, even viewed in light of the recording, was not so unreasonable as to be deemed inherently improbable. The jury's conclusion that Dominique told the truth and defendant's theory was not credible is therefore binding on this court. The evidence adequately supported the verdict.

Defendant cites three cases as example of appellate courts reversing judgments on the ground of inherent improbability. In *Headlee*, *supra*, 18 Cal.2d 266, the defendant was charged with kidnapping for the purpose of robbery and two counts of rape. The three victims, two women and a male taxicab driver, testified that the defendant, armed with a gun, hijacked a taxicab containing two female passengers. He raped one of the women, Miss Cash, in the backseat, then ordered the driver to take him and the women to a motel. When they arrived, the defendant and the driver went to the office and secured two rooms, and were gone five minutes. The four then drove to the rooms, defendant and Miss Cash taking one and the driver and the other woman taking the other. Miss Cash testified defendant raped her again in the motel room. She admitted on cross-examination that she made no attempt to escape, and "[b]efore entering the cabin she did not plead or remonstrate with the defendant," and "[w]hen the defendant told her to undress she did not protest; instead, she 'never said a thing.'" (*Id*. at pp. 269-270.)

The jury convicted the defendant of kidnapping and rape in the motel room, but acquitted him of the rape in the taxicab. On review, the supreme court held that "the conclusion that [the] witnesses did not consent, either actively or passively, to the occurrences of that evening is incredible. None of them offered any objection when the defendant allegedly engaged in an act of sexual intercourse with Miss Cash in the cab against her will. Nor did they in any manner attempt to prevent the defendant from carrying out his act." (*Headlee*, *supra*, 18 Cal.2d at p. 273.) And "[n]o effort was made by either woman to drive the car away or to leave the car and attempt an escape by foot under cover of darkness . . . . This is not the conduct of a person who has been kidnap[p]ed or assertedly the victim of a previous attack." (*Ibid*.) Further, the court observed, "[t]he conduct of Miss Cash in the cabin [did] not reveal any opposition on her part to the proceedings. She made no objection to entering the cabin with the defendant. . . . The asserted attack in the cabin admittedly took place without any plea or word of protest or objection from her. Concededly, she exerted no physical effort to prevent the alleged assault." (*Id*. at p. 274.)

*Headlee* is distinguishable. There, the issue was whether the jury could reasonably conclude the victims did not consent to the defendant's actions. The supreme court held it could not because the victims acquiesced to everything defendant did, despite several chances to offer protest or resistance, and because the jury itself impliedly found Miss Cash consented to the first act of intercourse, in a taxicab with two bystanders present, rendering her refusal to consent to the second act, in a private motel room, inherently improbable. Further, the court observed that the jury's acquitting the defendant of rape in the taxicab indicated it concluded either the act did not occur or was performed with the victim's consent. In either case, the jury could not reasonably believe Miss Cash's testimony as to defendant's conduct in the motel room. (*Headlee*, *supra*, 18 Cal.2d at pp. 274-275.)

Here, in contrast, no evidence suggests Dominique acquiesced to defendant fondling her breasts or touching her labia, and nothing suggests the jury disbelieved any part of Dominique's testimony.

Defendant does not suggest the contrary. In fact, defendant fails specifically to identify what part of Dominique's testimony should be disbelieved; he argues only that her "allegations" are inherently improbable, but not because it would have been impossible to commit the acts of which he is accused, not because any evidence suggests Dominique consented to the acts, and not because the jury disbelieved one part of Dominique's testimony and therefore could not reasonably credit other parts. Defendant argues Dominique's allegations are improbable because after the assault she did not behave like a normal sexual assault victim would have behaved. As discussed above, we reject the argument.

Defendant also cites *Carvalho*, *supra*, 112 Cal.App.2d 482 and *U.S. v. Chancey* (11th Cir. 1983) 715 F.2d 543 (*Chancey*).

In *Carvalho*, another kidnapping case, although the complaining witness testified she was in fear of the defendant, the appellate court noted that "[n]either during the time the complainant was with appellant nor in the month thereafter did her actions and conduct reflect any fear of him." (112 Cal.App.2d at p. 490.) The complainant had had

14

numerous opportunities to leave, but chose not to. And she testified that while she was with the defendant at his rooming house, purportedly against her will, they "commenced 'making love,' which was consummated by an act of sexual intercourse between them. [Then,] he went down the hall to the bathroom while the prosecutrix remained in the bedroom where the weapon was allegedly reposing on the dresser or in a drawer, and she waited for him to return. Appellant then shaved, removed his clothing and proceeded to take a bath. With all this opportunity to leave she proceeded into the bathroom and washed his back, neck and arms for him." (*Ibid*.) Later, the couple went to a café, and "[w]hile enroute to dinner she stopped her automobile, alighted therefrom, went into a public telephone booth and called her son. She did not advise her son of her claimed predicament, nor did she telephone the police. [¶] When appellant finally left her, saying he would take a streetcar to his home, she made no complaint to the police." (*Ibid*.) The *Carvalho* court held that "[t]he foregoing circumstances do not in our opinion reasonably justify the conclusion reached in the court below that the prosecutrix was transported by the use of force and held in captivity through fear on her part." (*Id*. at p. 491.)

Similarly, in *Chancey*, *supra*, 715 F.2d 543, a third kidnapping case, the appellate court accepted as true everything the victim said about being kidnapped and driven from Florida to California, but held that "her every act and deed, as she described them, shout that when she drove the car across the Florida state line, she did it voluntarily. And the same is true from Florida all the way to California and after the travelers arrived there." (*Id*. at p. 547, italics omitted.) It concluded those facts lead to the conclusion that the victim had not been held against her will.

Again, defendant does not explain exactly what facts asserted by Dominique are improbable—he argues only that her "allegations" must be rejected. Which ones? If he contends it is inherently improbable that he fondled her breasts, the cases he cites are inapposite because in each the court accepted as true the victim's recitation of facts; the only issue was whether the victim consented to the acts complained of. If defendant contends it is improbable that Dominique did not consent to the fondling, *Headlee*,

15

*Carvalho* and *Chancey* are distinguishable because each involved ongoing conduct by the victim that was consistent with consent, and no conduct that was inconsistent with it.

In sum, defendant "is actually asking us to *disbelieve* the witnesses' claims about what happened, on the ground that surrounding circumstances, and other evidence adduced in the case, makes those claims seem unworthy of belief.  That we cannot do." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 732.)  "'Generally, "doubts about the credibility of [an] in-court witness should be left for the jury's resolution."'  [Citation.] 'Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution … .'  [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)  "'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.'  [Citation.]  Such cases are rare indeed.  [Citation.]" (*DiQuisto v. County of Santa Clara*, *supra*, 181 Cal.App.4th at p. 261.)

### 2.  Stacey Y.

Defendant was convicted in count 2 of attempted sexual battery on Officer Stacey Y.  Stacey Y. testified that in June 2008, defendant lifted her shirt and bra and put his hand on and held her left breast.  Defendant argues discrepancies between Stacey Y.'s testimony and an audio recording of the incident, and a comment she made to fellow officers afterward, demonstrate that her allegations were inherently improbable.

Stacey Y. was wired for sound for her examination by defendant, and the sound recording was played for the jury and a transcript was provided.

Stacey Y. testified that moments before defendant touched her breast he asked her to look over his left shoulder.  She testified he told her to take off her sweater on the pretext of wanting to look at her stomach, and when he touched her breast she said, "Whoa, Whoa, Whoa.  What are you doing?"  But the transcript of the audio recording does not reflect any such statements by either defendant or Stacey Y.  At the point in the examination when defendant touched Stacey Y.'s breast, the audio recording reflects the following conversation occurred:

16

"Kevin Brown:  . . .  You don't have any other medical problems, right?

"[Stacey Y.]: No, just—I mean, I just been a little on the, you know—

"Kevin Brown:  Uh-huh.

"[Stacey Y.]: —tired side a little bit, having little issues, you know?

"Kevin Brown:  Sit up straight.

"[Stacey Y.]: Okay.

"Kevin Brown:  Oh, I'm sorry.  I'm sorry.  I thought you had on a—

"[Stacey Y.]: No, I just have a --

"Kevin Brown:  Okay.  So that is your bra?

"[Stacey Y.]: Yeah.

"Kevin Brown:  Okay.

"[Stacey Y.]: Yeah, that's my bra.

Defendant argues the discrepancy between the audio recording and Stacey Y.'s testimony on these points demonstrates her testimony on the main point—that he lifted her bra and held her breast—is inherently improbable.

Trial was in August 2011.  That Stacey Y. got some secondary details wrong is unremarkable, as discrepancies between events and recollection of those events years later are to be expected.  Whether defendant told Stacey Y. to look over his shoulder or take off her sweater, and whether she actually verbalized her surprise or merely thought she had done so, are immaterial to the question of whether she accurately remembered defendant lifting her bra and holding her breast.  We cannot conclude that discrepancies as to ancillary matters render her testimony on the main point inherently improbable.

Defendant also argues Stacey Y. did not sound upset on the audio recording, but on the contrary was laughing when speaking to other officers after the incident, and did not say during the examination—for the benefit of those she knew were listening—that she had been fondled.  He contends this response to the examination indicates the fact of her having been assaulted is improbable.  We disagree.  As discussed above with respect to Dominique H., the range of human reaction to trauma is broad enough to include stoicism, especially when the victim is a trained police officer working undercover.  Lack

17

of immediate reaction to an assault does not render the fact of the assault inherently improbable.

Finally, when Stacey Y. visited defendant it was anticipated that a second visit might be necessary because it was unknown whether Stacey Y. would get in to see defendant the first time or, if she did, whether he would incriminate himself. When Stacey Y. returned to her colleagues after the examination, she said, "he's gonna bite the next time." Defendant argues Stacey Y. would not have made this comment had he "'bitten,'" or touched her inappropriately, during the examination. We disagree.

After Stacey Y. left defendant's medical offices she maintained voice contact with her fellow officers, who were at a staging area approximately one mile away. She informed them when she walked out of the facility, and then that she was driving away while keeping a watch to see if anyone followed her. The transcript of the audio recording contains her side of the conversation. While driving, she said, "Yes, he did it. He's a fuckin' per—huh? Yeah, the—but my reaction was, you know, I grabbed him, you know, and, and put it down, of course, you know? . . . [¶] . . . Sweetie, he, he, he raised my shirt up so fast. I was, like—and then I—when I said it, he, like, I, I'll tell you how, I mean, his reaction. . . . [¶] Yes, he went to touch them, and I—but my reaction was just to, you know, jump, cause, I mean, it was so frickin' fast. I was, like, I mean, I saw—I looked down and saw my titties. I'm like, holy crap. You know? And he's just, like, oh, oh, you didn't—I, I thought—oh, there was no bra under there."

When Stacey Y. arrived at the staging area, the conversation proceeded:

"[Stacey Y.]: It shocked me though for a second. I was, like, you nasty old bastard."

"Unknown Male: He went for the booby grab?

"[Stacey Y.]: Yeah, oh, he did—

"Unknown Male: Did he, did he go under your shirt?

"[Stacey Y.]: He went, he went so fast. Cause, like, cause I knew when he was talking and he's trying to figure out a way to get up from the ankles. And he did a—I said, oh—I nearly said, oh, no, he's legit. You know, he did, I mean, every—cause I've

18

had ankle stuff, and he did everything perfect. [¶] He goes over. He washes his hands, you know, so I'm thinking, okay, we're gonna be done. So he said, anything else? I'm, like—you heard me say, no, whatever? And then all the sudden he's like, he goes over to take, you know, to take this off, and I'm, like, okay. What? What? Right? To take this off. [¶] And before you know it, he's, like, going over—he went under—he raised my shirt, didn't even tell me, raised up my shirt. Before you know it, I saw my titties. I'm, like, I'm, like, and I grab—I mean, I just—that was my reaction just, you know, to grab it, and he just, like, backed up, like, oh, oh, oh. [¶] . . . . [B]ut he just—I mean, he was there before I could even—he was that quick and— [¶] . . . . [¶] . . . . The way—but I tried to just, like, stay calm and—so that way he could, you know, feel a little trust with me. And when he said, I want you back in a week, I'm, like, okay, he's gonna try it, you know, with the blood test. [¶] . . . . And he's gonna try for sure. I mean, I was surprised, cause I was giving him the benefit of the doubt after he did the exam on my ankle. I'm, like, oh, no, he's legit. He's good. He'd done everything, washed his hands. I'm thinking I'm about to walk out the door. [¶] And before you know he, he went up to the shoulder. And I was, like, okay. Then he started checking my ears and my eyes and look this way. And that's what he did. He had me look this way, and he—before you know it, he had—he was doing this. And the shirt went up that quick. [¶] And then—and all the sudden I just grabbed. He said, oh, I didn't—he said, there's a bra under there? And I'm like, okay. Ask, asked me after the fact, cause—and I looked down and totally exposed. I was, like, wow. He was quick. He got that—I mean he got my shirt up very, very quickly."

"Unknown Male: Uh-huh.

"[Stacey Y.]: Was, like, okay, Stacey, breathe, you know? Cause I said, he's gonna, he's gonna bite the next time for sure, for sure, cause he, he just needed --

"Unknown Male: Uh-huh.

"[Stacey Y.]: —that excuse to—and once he told me my exam or my blood thing—cause there's no reason for me to come back."

Defendant was accused in count 2 of attempted sexual battery by fraud, it being alleged that he attempted unlawfully to touch an intimate part of Stacey Y. for the purpose of sexual arousal, gratification and abuse. In Stacey Y.'s conversation after the incident she told her colleagues defendant "went to touch" her breasts. Despite Stacey Y.'s being a trained police officer who had gone undercover to witness just such an assault, instead of permitting defendant to complete the assault she reacted reflexively, immediately grabbing defendant and pulling her shirt and bra down. Seen in this light, the jury could reasonably conclude that Stacey Y.'s comment afterward that defendant would "bite" next time was a reference to an anticipated future occasion when she would not prohibit defendant from completing the assault. Under these circumstances, we cannot conclude as a matter of law that the comment renders her testimony incredible.

### 3. A.G.

Defendant was convicted of sexual battery of A.G. by fraud, sexual exploitation by a physician, and lewd and lascivious conduct against a minor. A.G. testified that when she was 15 years old she had been experiencing pain deep on the left side of her right breast. The area was tender, and she could feel a lump. She went to defendant for a breast examination. Defendant "touched" the lump but did not examine any other part of her right breast. Instead, A.G. testified, without seeking permission or giving an explanation, he "grabbed" the left breast, "caressed" and "squeezed it" several times with his full hand, using the palm and five fingers, and "played" with her left nipple. A.G. thought the touching was "something like a loving thing." She said, "it would have seemed differently if he touched them the same way. Maybe if he touched both the spots, maybe the one that was irritating me and the one that wasn't to see if there was one there also, and that wasn't the case. It would maybe be different if he treated them both the same way."

Doctor Denise Sur, the prosecution's medical expert, testified this was an extreme departure from the standard of care, which required that defendant provide a chaperone for the exam and seek permission before touching A.G.'s breast. Dr. Sur testified that a breast examination is conducted by using fingertips to press breast tissue against the chest

20

wall to determine whether an abnormal mass or lump exists. The physician would start from the outer parts of the breast, working around and inward to include all parts of it, including the nipple. Pressing the breast in a circular motion was once recommended by the American Cancer Society, but no longer. In no case would the physician grab, squeeze, caress, fondle or superficially rub the breast, as the object is to apply pressure to the point that the examiner could feel something between the chest wall and the examiner's fingertips, and superficial rubbing would be neither helpful nor diagnostic. Dr. Sur testified defendant's examination of A.G. "was not a typical breast exam that would benefit the patient for screening purposes."

Defendant argues that a 15-year-old girl who has never before had a breast examination is in no position to judge the propriety of such an examination.

We flatly reject the argument. As discussed above, witness credibility is quintessentially a jury question, the resolution of which turns in large part on the witness's demeanor, age, and relative inexperience. A jury may reasonably conclude that a 15-year-old girl can tell the difference between a medical examination and a sexual assault.

Moreover, here the jury had not only A.G.'s characterization of the assault, which by itself was enough to support the conviction, but also Dr. Sur's testimony that a legitimate breast examination would have been nothing like the examination defendant gave A.G. The jury also had A.G.'s description of the different ways defendant treated her right and left breasts. Even if A.G. did not know at first what to expect, defendant quickly educated her when he "touched" the lump in her right breast, and she could certainly tell the difference between the way he touched the right breast and the way he grabbed, squeezed, caressed and played with the left.

### 4. Carla K.

Carla K. testified she visited defendant's medical offices to obtain authorization for a CAT scan. In an examination room, defendant quickly and without warning grabbed her bra and lifted it over her breasts (twice), grabbed her left breast, unzipped her skirt, stripped her panty hose and panties to her ankles, caressed her buttocks, and put his

21

hand on her inner thigh and drew it up until he was touching her clitoris. Carla also testified that defendant came to her home the next day and raped her.

He appeared at her door and bullied his way in. She sat on the couch and engaged in a brief conversation with him, followed him around as he surveyed her home, let herself be pulled into the bedroom, agreed to let him give her a massage on her bed, and even told him where some lotion was. She testified that after a brief massage, defendant raped her. In the following days, Carla communicated with defendant several times by telephone, email, and text messaging, not only to follow up on the CAT scan authorization but also to accept his invitation to a fundraiser at the Playboy Mansion.

Defendant was convicted of sexual battery of Carla K. by fraud and sexual exploitation by a physician, but acquitted of charges of forcible rape and sexual penetration by a foreign object.

Defendant argues Carla K.'s "testimony implicating [him] in a series of sexual assaults must be rejected as inherently improbable" because her actions after the assault were "completely contrary to the normal, ordinary conduct of a victim of such sexual assaults." Carla admitted she did not push defendant away or otherwise fight during the medical examination, did not call out for help, and did not tell anyone afterward what had happened. On the contrary, she contacted defendant's office three days later to reiterate that she needed the CAT scan and communicated with him several times in the days following, going so far as to accept an invitation to an event at the Playboy Mansion.

As above, defendant does not specify exactly what part of Carla K.'s testimony must be rejected. If he suggests her testimony that he fondled her during the medical examination was incredible, the argument is incognizable on appeal because nothing about the action itself is impossible or inherently improbable. If he suggests it is improbable that she did not consent to his yanking her bra over her breasts, stripping her skirt and panties to her ankles, and grabbing her breast and buttocks, the argument is rejected because, for reasons discussed above, Carla K.'s post-assault conduct was not determinative on the issue of consent. The jury was entitled to conclude that a medical patient would not normally consent to such an examination.

### 5. Tina S.

Defendant was convicted of sexual battery of Tina S., sexual exploitation by a physician, and two counts of sexual penetration by a foreign object. Tina S. testified defendant fondled her breasts and, on a later occasion, inserted a speculum or his fingers into her vagina without permission, causing some tearing, and held her down and tried to force his penis into her vagina while she sat in an OB-GYN table.

Defendant first appears to argue it is physically impossible to insert something into a woman's vagina when she is sitting on an OB-GYN table. Because he cites no authority or evidence to support the argument, we reject it outright.

Defendant next argues Tina S.'s testimony did not describe a criminal act, as Dr. Sur, the prosecution's expert, confirmed that using a speculum or fingers is perfectly proper in conducting an internal vaginal exam. But Dr. Sur also testified that the two fingers inserted into a woman's vagina are used to push pelvic organs up to the abdominal wall so they can be palpated with a second hand held over the abdomen, which defendant did not do. In any event, Tina did not go to defendant for an internal vaginal examination, she went to pick up medication.

Finally, as he did with respect to other victims, defendant argues Tina's "testimony as a whole" was inherently improbable because she did not know the dates of the two assaults, her testimony regarding events was sometimes inconsistent, and she did not immediately report the assaults to police. For reasons discussed above, nothing about Tina's testimony or other evidence adduced at trial renders the sexual assaults inherently improbable.

### B. Sexual Battery by Fraud

"[T]o be guilty of sexual battery by fraud, the perpetrator must touch an intimate part of the victim for sexual purposes and, at the time of the touching, the victim must be 'unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose.' (Pen. Code, § 243.4, subd. (c).)" (*People v. Pham* (2009) 180 Cal.App.4th 919, 924.) Defendant contends insufficient evidence supported his convictions for sexual battery by fraud, or in the case of Officer Stacey Y.,

23

attempted sexual battery by fraud, because no evidence suggested he expressly told his patients that the precise touching at issue served a professional purpose. We conclude sufficient evidence supported defendant's convictions.

"Traditionally, the law has distinguished between two types of fraud in analyzing the issue of consent in sex crime cases, fraud in the fact and fraud in the inducement. Fraud in the fact occurs when the defendant obtains the victim's consent to perform one act, but instead engages in another act. [Citations.] In that situation, consent is absent, and the defendant is guilty of sexual battery because the victim never agreed to the particular act complained of. [Citation.] [¶] By contrast, fraud in the inducement takes place when the defendant makes misrepresentations to the victim in order to get her consent for a particular act, and then proceeds to carry out that very act. [Citations.] In that situation, courts have historically been reluctant to impose criminal liability on the defendant since the victim consented to the particular act performed, albeit under false pretenses." (*People v. Pham*, *supra*, 180 Cal.App.4th at p. 925.)

"However, in 2002, the Legislature sought to expand the circumstances under which a defendant may be prosecuted for fraudulently inducing a victim to consent to sexual conduct. Now, in addition to prohibiting fraud in the fact, California law proscribes 'a narrow set of circumstances involving fraudulent inducement: those in which the victim was unaware of the nature of the act due to the perpetrator's fraudulent representation that the sexual [assault] served a professional purpose.' [Citation.] The law was enacted 'to close a loophole' that allowed defendants who committed sexual acts on their patients under the guise of medical treatment to escape punishment for their conduct. [Citation.] In that regard, the law represents a clear 'legislative judgment[] that fraud and coercion are totally inappropriate in certain alliances between holders of positions of trust and their patients.' [Citation.]" (*People v. Pham*, *supra*, 180 Cal.App.4th at pp. 925-926.)

Defendant argues he did not commit sexual battery by fraud against any of his patients because he did not expressly tell them his touching their intimate body parts was for professional, medical purposes, and none knew beforehand that he would touch them

24

as he did.  On the contrary, he argues, the victims typically testified to their surprise and shock at the touching in question.  The argument is without merit.

Defendant did not have to deceive his patients in explicit terms to be guilty of fraudulent representation under Penal Code section 243.4, subdivision (c).  To violate the statute the assailant need only "'fraudulently represent[] that the touching served a professional purpose.'"  (*Ibid*.)  "In keeping with the statute's intent to criminalize sexual acts committed under the guise of professional services, it only makes sense to consider the totality of the defendant's conduct—not just his verbal statements—in determining whether he fraudulently represented the nature of his actions.  After all, actions often speak louder than words:  'A false promise can as easily, perhaps more easily, be implied from conduct as from language . . .'.  [Citation.]" (*People v. Pham*, *supra*, 180 Cal.App.4th at p. 926.)

"We must also be mindful of the fact that, when it comes to treating their patients, physicians occupy a position of implicit trust.  A medical professional 'who holds him or herself out to the public as one available to administer to the medical needs of patients through examination and treatment is burdened with the duty to act for medical purposes in dealing with patients seeking medical care.  There is an inherent trust and confidence which a patient seeking medical care places in the [professional] and upon which a patient relies in allowing the [professional] access to the most intimate parts of the body.' [Citation.]" (*People v. Pham*, *supra*, 180 Cal.App.4th at p. 926.)

Sufficient evidence supported the jury's conclusion that defendant used his position as a medical professional to perpetrate crimes.  His victims all came to him with the expectation of receiving medical treatment.  When they arrived, they signed in, had their vital signs checked, and were taken to an examination room, as would be expected in a medical setting.  They understood defendant would be touching their bodies to diagnose and treat their illness.  Defendant did nothing to dispel this message.  Instead, he used it to obscure his true intentions.  With each patient he entered the room, asked about their illnesses, and conducted a true medical examination.  In all cases he gave the

25

appearance his actions were medically related. There is no evidence he displayed anything but a professional demeanor before assaulting the patients.

The totality of the circumstances provides ample evidence that defendant fraudulently represented to each of the victims his inappropriate touching served a professional purpose, even without an express representation to this effect, and tricked each victim into submitting to the touching on that pretext.

## II. EVIDENCE OF OTHER OFFENSES

### A. Charged Offenses

The prosecutor requested an instruction that if the jurors were to find guilt beyond a reasonable doubt on any enumerated count, they could "but [were] not required to, conclude from that evidence that the defendant was disposed or inclined to commit the crime[] of sexual battery by fraud . . . ." The instruction cautioned that any such conclusion would be "only one factor to consider along with all the other evidence."

Defendant contended in his opening brief that this instruction violated his due process rights because it permitted the jury to infer from its finding that he had committed some charged offenses that he had a disposition to commit other charged offenses. Defendant contended that only uncharged crimes could be admitted to support such an inference. However, after defendant filed his opening brief our Supreme Court expressly approved the instruction. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1167-1168.) Defendant admits in his reply brief that *People v. Villatoro* controls here.

Under Evidence Code section 1108, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) The *Villatoro* court concluded that "in authorizing the jury's use of propensity evidence in sex offense cases, section 1108 necessarily extends to evidence of *both* charged and uncharged sex offenses, affirming that such evidence is not 'made inadmissible by Section 1101.'" (*People v. Villatoro*, *supra*, 54 Cal.4th at p. 1162.) Accordingly, the jury instruction was proper.

## B.    Uncharged Offenses

Defendant was tried in 2004 on charges of assault with intent to commit a sex crime against a former patient and in 2007 for sexual battery against a patient and sexual exploitation by a physician.  He was acquitted both times.  In this case, the prosecution moved to admit evidence that defendant had been tried twice before for committing sex crimes against patients and was acquitted.  Defendant objected that the evidence would be unduly prejudicial under Evidence Code section 352.  The trial court admitted the evidence for the limited purpose of proving whether defendant's alleged conduct was the result of mistake or accident.  It instructed the jury it could, but was not required to, consider the evidence only for this limited purpose, and only if the prosecution proved by a preponderance of the evidence that defendant committed the crimes for which he was tried and acquitted.  Defendant contends the trial court erred in admitting the evidence.  We disagree.

Evidence Code section 1108 "allows evidence of the defendant's uncharged sex crimes to be introduced in a sex offense prosecution to demonstrate the defendant's disposition to commit such crimes."  (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009.)  Under section 1108, trial courts may not "deem such evidence unduly prejudicial per se, but must instead engage in a careful weighing process under Evidence Code section 352."  (*Id*. at pp. 1012-1013.)  "In exercising this discretion [under Evidence Code section 352] as to a sexual offense, 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offenses, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.'  [Citation.]  The court's ruling under section 1108 is subject to review for abuse of discretion.  [Citation.]"  (*People v. Loy* (2011) 52 Cal.4th 46, 61.)  "'''[E]vidence offered under [section] 1108 [sh]ould not be excluded on the basis of

27

[section] 352 unless "the probability that its admission will . . . create substantial danger of undue prejudice" . . . substantially outweigh[s] its probative value concerning the defendant's disposition to commit the sexual offense or offenses with which he is charged and other matters relevant to the determination of the charge. As with other forms of relevant evidence that are not subject to any exclusionary principle, the presumption will be in favor of admission.'" [Citation.]' [Citation.]" (*Id.* at p. 62.)

"As the legislative history indicates, the Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.)

The credibility of defendant's victims was the trial's central issue, as seven out of nine of them waited a significant amount of time before coming forward, and it was argued they could not accurately interpret events that occurred when they were being examined. The prior acts were similar in many respects to those charged here, as they involved sexual acts directed at patients or former patients both inside and outside the examination room, and occurred within roughly the same time frame as the charged offenses. The evidence of prior acts shared sufficient common features with the charged offenses to support the inference that the uncharged acts and the charged offenses were manifestations of a common propensity and modus operandi. Admission of evidence of the prior acts was thus relevant to assist jurors in assessing the credibility of the victims in this case.

This conclusion, however, does not end the inquiry. "Evidence that involves crimes other than those for which a defendant is being tried is admitted only with caution, as there is the serious danger that the jury will conclude that defendant has a criminal disposition and thus probably committed the presently charged offense." (*People v. Thompson* (1988) 45 Cal.3d 86, 109.) Although the evidence of defendant's uncharged

28

conduct is relevant, to be admissible it "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." (*Ibid.*) We must therefore examine whether the probative value of the evidence of defendant's uncharged offenses is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"The probative value of the evidence stems from the similarity between the uncharged offenses and the charged offenses—a similarity which, as noted above, is sufficient to support the inference that defendant [had a disposition to sexually assault his patients]. The close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence." (*People v. Balcom* (1994) 7 Cal.4th 414, 427.) "The probative value . . . also is increased because its source was independent of the evidence of the charged offenses," as the victims reported the manner in which defendant assaulted them without knowledge of how he had abused other victims. (*Ibid.*)

The prejudicial impact of the evidence arises from the circumstance that the uncharged acts resulted in a trial and acquittal, which could tempt the jury to convict defendant of the charged offenses regardless of his guilt, to punish him for the uncharged offenses.

But the risk of undue prejudice was reduced by the revelation that a prior jury had found defendant's conduct was not criminal. In some circumstances it might not be easy to distinguish between a proper genital or breast examination and a sexual assault, as evidenced by defendant's arguments on appeal that some victims could not tell the difference between the two. And if it is hard enough for a patient herself to distinguish between an examination and an assault, it is even more difficult for the jury to make its own determination at one remove. That a prior jury had found defendant's conduct was not criminal might have influenced the instant jury to consider similar conduct not to be criminal. The risk of undue prejudice was also reduced by defense counsel's suggestion to the jury that the prosecution did not respect jurors and the Los Angeles Police Department had a vendetta against defendant. Defense counsel told the jury, "A jury like

29

yourself listened to the evidence and concluded he's not guilty. And then the prosecution comes to you and says, 'Well, he did it before. He got away with it.' Meaning that jury was stupid? That jury got it wrong? [¶] . . . [¶] And because the police department ha[s] frivolous useless cases . . . and those cases were tossed out . . . , L.A.P.D. got angry. They decided they were going to have a vendetta. They are going to get this guy. They will bring him down."

Moreover, the court instructed the jury to consider the evidence only for the limited purpose of determining whether defendant's actions were the result of mistake or accident," and admonished the jury not to consider it for any other purpose, including the purpose of determining whether defendant was disposed to commit a crime.[2]

Weighing these factors, we conclude the probative value of the evidence of defendant's uncharged offenses, in establishing both his propensity to molest his patients and the absence of mistake, outweighed its prejudicial effect. Accordingly, the trial court did not err in admitting the evidence.

## III. PROSECUTORIAL MISCONDUCT

At some time before trial, A.G., Carla K. and Tina S. applied for and received restitution from the state's victim restitution fund in the amount of $1,000 to $2,000. The prosecution informed the defense of this fact on September 21, 2011, more than a

---

[2] The trial court instructed the jury under CALCRIM No. 1191 on the preponderance-of-the-evidence standard of proof necessary for the prior sexual offenses and the limitations on use of the evidence: "Evidence has been presented that the defendant was accused of, charged with, tried for, and acquitted of alleged crimes involving Gail N. and Irese C. These crimes are not charged in this case. [¶] . . . [¶] You may consider the particular evidence listed in this instruction only if the People have proved by a preponderance of the evidence that the defendant in fact committed the particular uncharged crime or act or engaged in the particular uncharged behavior. . . . [¶] . . . [¶] If you decide that the People have met this burden as to the particular evidence, you may, but are not required to, consider the evidence for the limited purpose of deciding whether or not: [¶] . . . [¶] The defendant's alleged actions were the result of mistake or accident. . . . [¶] . . . [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged crimes, acts, and behavior and the charged crimes. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime."

month after trial. Defendant moved for a new trial, arguing the fact that some victims were paid restitution constituted newly discovered evidence. Defendant also argued the prosecution committed misconduct by not disclosing the restitution during trial. The trial court denied the motion, finding the prosecution committed no misconduct because it did not know about the restitution during trial. The court also found the new information was immaterial and would not have affected the outcome of the case.

Defendant argues the prosecutor violated his constitutional and statutory rights by failing to produce evidence of restitution in a timely manner. (See Pen. Code, § 1054.1 [prosecution must disclose all relevant and exculpatory evidence]; *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*) [due process requires prosecution to turn over all material evidence to the defense].) We disagree.

Evidence that impeaches or challenges the credibility of a witness whose testimony might affect the verdict must be disclosed to the defense in a timely manner. (See *In re Ferguson* (1971) 5 Cal.3d 525, 531-533.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)

Here, the prosecution committed no misconduct because it is undisputed the prosecution did not know until after trial that three victims had received restitution. Defendant argues the prosecution is charged with constructive knowledge of evidence known to any other state employee. The argument is without merit.

The scope of the prosecution's disclosure obligation "extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any favorable evidence known to the others acting on the government's behalf . . . .' [Citation.] Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel."' [Citation.] 'A contrary holding would enable the prosecutor "to avoid disclosure of evidence by the

31

simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial,'" [citation].' [Citations.] Thus, 'whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government.' [Citations.] [¶] As a concomitant of this duty, any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution. 'The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.' [Citations.] The Supreme Court recently reiterated this principle: 'whether the prosecutor succeeds or fails in meeting this obligation [to learn of favorable evidence] (whether, that is, a failure to disclose is in good faith or bad faith, [citation]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.' [Citations.]" (*In re Brown* (1998) 17 Cal.4th 873, 879-880, fn. omitted.)

Accordingly, the prosecutor's duty to disclose exculpatory information extends not only to information of which the prosecutor herself is aware, but as to any information known to others in government who participate in the investigation. But no authority of which we are aware, and none cited by defendant, supports the proposition that the prosecutor is charged with constructive knowledge of information possessed by all government employees, whether or not they participate in the prosecutor's investigation. On the contrary, "information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material." (*People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1315.)

*People v. Blackman* (Ill.Ct.App. 2005) 836 N.E.2d 101, upon which defendant relies, is distinguishable. There, the prosecution failed to divulge that it had paid relocation expenses to a key witness, which the appellate court held constituted a *Brady* violation. (*Id*. at p. 107.) Here, it was not the prosecution that paid restitution to three victims, but the California Victim Compensation and Government Claims Board (Gov.

Code, § 13900), a separate entity that did not participate in the investigation or prosecution of defendant. The prosecutor had no duty to obtain information pertaining to those payments.

Defendant argues in the alternative that the fact that victim restitution was paid to three witnesses constituted newly discovered evidence justifying a new trial. We disagree.

A motion for new trial may be granted only when "the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

Defendant argues he was entitled to a new trial based on newly discovered evidence because if he had known that A.G., Carla K., and Tina S. received money for medical and relocation expenses he would have used that information to establish their bias in favor of the state by showing they made their allegations against defendant in an effort to profit monetarily, thus impeaching their testimony.

We do not think it likely a different verdict would have been reached had the defense informed the jury that three victims received restitution. First, the amounts in question did not substantially enrich the witnesses. Carla K. received $863 for lost income, $199 for medical treatment, and $190 for mental health counseling. Tina S. received $1,880 for relocation expenses. And A.G.'s mother received $2,000 for relocation services. It is unlikely the money was enough to induce any of the victims to relive their experiences in front of a jury or brave cross-examination. Second, the connection between restitution payments and the victims' testimony was tenuous at best, as nothing in the record suggested the restitution payments were contingent on the

33

victims' testifying (or even on defendant being prosecuted at all). Although subdivision (b)(1) of Government Code section 13956 provides that restitution may be denied if the victim fails to "cooperate reasonably" with law enforcement in the conviction of the perpetrator, nothing in the record suggests payments to these victims was contingent on their testifying against defendant. (See *id*. ["in determining whether cooperation has been reasonable, the board shall consider the victim's . . . age, physical condition, and psychological state . . . and giv[e] due consideration to the degree of cooperation of which the victim . . . is capable . . ."].) Third, the fact that three witnesses received victim restitution from a state agency might have tended to bolster the prosecution's case in chief in the jury's eyes by indicating the state endorsed their status as victims.

Because the minimal impeachment value defendant could obtain from the existence of restitution payments would be counterbalanced by the likelihood that existence of the payments would cast the witnesses as true victims in the eyes of the jury, we conclude no reasonable probability exits that a different verdict would be obtained if the matter were retried. The court thus properly denied defendant's motion for new trial.

## IV. STATUTE OF LIMITATIONS

Defendant's final contention is that his trial and prosecution on counts 26 and 27 were time barred and violated his due process rights. We agree.

With certain exceptions not applicable here, the limitations period for prosecution for an offense punishable by imprisonment in the state prison is three years. (§ 801.) The People must prove, by a preponderance of the evidence, that the prosecution was initiated within the statutorily prescribed time period. (*People v. Zamora* (1976) 18 Cal.3d 538, 565, fn. 26.) When the defendant is alleged to have committed multiple acts that give rise to a single count, and some of those acts occurred within the limitations period and some without, the prosecution must prove the offense could only have occurred within the applicable period. (*People v. Angel* (1999) 70 Cal.App.4th 1141, 1146-1147.)

34

Although it is unclear from the record exactly when the instant prosecution commenced, the Attorney General asserts, and defendant agrees, that it commenced on August 2, 2008, with the filing of the People's complaint. Therefore, prosecution was time barred for any offense occurring before August 2, 2005.

Counts 26 and 27 of the information charge defendant with committing sexual battery by fraud on or between May 19, 2003 and December 7, 2006 and sexual exploitation by a physician against Tina S on or between September 4, 2005 and December 7, 2006. In count 26 the information alleged defendant "did unlawfully touch an intimate part of TINA S." for the purpose of sexual arousal. In count 27 the information alleged defendant "engaged in an act of sexual contact with" Tina S. In counts 24 and 25 the information alleged defendant committed the crime of sexual penetration by a foreign object against Tina S.

The prosecution maintained that defendant assaulted Tina S. twice. Sometime between 2003 and 2006 he fondled her breasts, and in September 2006 he inserted a speculum or his fingers into her vagina without need or authorization. The prosecutor argued to the jury that counts 24 and 25 "pertain to the speculum or fingers being inserted inside" Tina S, and counts 26 and 27 "pertain to the breast touching."

The jury found defendant committed sexual battery by fraud and sexual exploitation by a physician "on or between May 19, 2003 and December 7, 2006, as charged in" counts 26 and 27 of the information.

The Attorney General concedes the act of fondling Tina's breasts was not proven to have occurred later than August 2, 2005. However, respondent argues, it is undisputed defendant's wrongful pelvic examination of Tina occurred after that date, and that act alone was sufficient to establish both sexual battery by fraud and sexual exploitation by a physician as charged in counts 26 and 27. We agree, but that is not what the prosecutor argued to the jury, and nothing in the record suggests the jury based its verdict on counts 26 or 27 on the wrongful pelvic examination. On the contrary, we presume the jury followed the prosecution's lead and assigned the pelvic examination to counts 24 and 25 and the breast fondling to counts 26 and 27.

35

Because we cannot tell whether the jury convicted defendant on counts 26 and 27 of offenses not shown to have been committed within the period of limitations, the convictions on those counts are time barred and must be reversed.  (*People v. Angel*, *supra*, 70 Cal.App.4th at pp. 1146-1147.)

## DISPOSITION

The convictions on counts 26 and 27 are reversed with directions to the trial court to dismiss these counts.  The trial court is further directed to prepare an amended abstract of judgment reflecting this dismissal and recalculating appellant's sentence, and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.