[No. G040848. Fourth Dist., Div. Three. Dec. 28, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
CHI VAN PHAM, Defendant and Appellant.

COUNSEL

Phillip I. Bronson, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Kristen Kinnaird Chenelia and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—There appears to be no limit to the ability of our species to devise new and different bad things to do to each other. Here we deal with a criminal hybridization of fraud and molestation first addressed by legislation in 2002. The issues presented appear to be of first impression in California.

Chiropractor Chi Van Pham was convicted of sexual battery by fraud (Pen. Code, § 243.4, subd. (c)) for touching the intimate body parts of his patients while purporting to examine them. He contends there is insufficient evidence to support the convictions because he did not mislead the patients into believing the touching was for professional purposes. However, considering the totality of the circumstances surrounding the examinations, the jury could reasonably conclude the patients were unaware of the sexual nature of the touching due to Pham's fraudulent representations. Therefore, we uphold his convictions and affirm the judgment.

## FACTS[1]

### Count 3

In 2003, Julie, then 13 years old, was involved in a serious car accident which left her with pain in her hip, back and neck. As part of her treatment, she went to Pham's office for chiropractic adjustments and physical therapy. The first two times Pham treated her, nothing remarkable occurred. But on the third occasion, his purported treatment became more intrusive. Pham had her lie down on her back and began massaging and adjusting her neck. He worked his way down her chest until his hands were massaging her breasts over her clothing. Then he slid his hands under her shirt and bra, cupping a breast in his hands. Beginning at the lower portion of the breast, he felt his way upward before circling his hands around the nipple. He also touched Julie's other breast in this fashion.

Pham touched Julie's breasts this way during at least five other treating sessions. He also expanded the scope of the touching on one occasion. This occurred while Pham was examining Julie and making various adjustments to her body. In the process, he unbuttoned her jeans and slid his hand down her pants and inside her underwear. Then he moved his hand between her legs and touched her genitals, working his way around the outside of her vagina. The touching lasted about 30 seconds, during which time both he and Julie remained silent.

Julie was confused by Pham's conduct. Although it made her feel uneasy, she had signed a consent form advising her that certain procedures that Pham

---

[1] The prosecution charged Pham with 11 counts of misconduct, ranging from simple battery to lewd and lascivious conduct on a person under the age of 14. One count was dismissed before trial, three were dismissed after the jury was unable to reach a verdict as to them, and on two other counts, the jury acquitted Pham of the charged offense. As to four of the remaining five counts, the jury found Pham guilty of the charged offense of sexual battery by fraud. It is those four convictions Pham challenges on appeal, and therefore, we will limit our statement of facts to those counts. Because the victims' last names do not appear in the record, we will refer to them only by their first names.

performed on her might make her uncomfortable. For a long time, she believed the touching was simply part of those procedures. However, in 2005, she volunteered in Pham's office, and one day Pham kissed her and came on to her while they were alone in the X-ray room. In the wake of this incident, Julie spoke with the police, and they convinced her to call Pham and confront him about his conduct. While denying any wrongdoing, Pham told Julie not to tell anyone he had touched her private areas. He also told her he would like to be her boyfriend and have sex with her.

*Count 7*

In 2005, 24-year-old Elsa sought treatment from Pham for back and neck injuries she suffered in a car accident. Upon arriving at his office, Pham checked her blood pressure and reflexes. He then had her lie down on her back on an examination table. Despite the fact she was fully clothed, Pham placed one towel across her lap and another towel across her chest. He then placed his stethoscope on her chest and touched her stomach under her shirt. After that, he directed his attention to her chest, sliding his hand under her bra and touching her left breast. Then he moved to her right breast, working his hands in a circular motion and touching her nipple. While he was touching Elsa in this manner, he asked her a number of questions about her accident.

Elsa was shocked, frightened and confused by Pham's conduct. Although an assistant was in the room at the time, Elsa did not say anything to her when Pham stepped out. Nor did she say anything to anyone else at Pham's office about the incident. However, when she got home later that day, she told her mother about it, and a few days later, she reported Pham to the police. She did not return to Pham's office for any further treatment.

*Counts 8 and 9*

After a serious car accident in 2004, Toan, then aged 24, experienced severe upper and lower back pain that radiated into both of her legs. Her attorney referred her to Pham, and during their first session, Pham examined her with an assistant present. Although Toan did not report having any chest pain, Pham patted her chest and collar area during the examination. During a subsequent session, he informed Toan her collarbone was out of place, and she signed a consent form permitting him to touch her chest for treatment purposes.

During Toan's next appointment, Pham had her lie down on her stomach on an exam table. After working on her back, he moved down to her buttocks and pressed his hands over her clothing. Then he slid his hands under her

pants and underwear, so he was touching her bare buttocks. During this time, he was patting Toan's buttocks and applying pressure to them. The touching felt strange to Toan, but she thought Pham was just making adjustments to her body.

Next, Pham had her lie on her back and proceeded to slide his hands under her shirt and bra. His hands were touching her breasts and nipples for several seconds with what Toan described as a "tapping rub." After that, he slid his hands under her pants and underwear. Although he did not touch her vagina, he did pat and touch around her pubic area.

That night, Toan told her mother about the exam, and she also talked to the attorney who had referred her to Pham. The attorney advised her to go back to Pham but to confront him if he touched her in a manner she believed was inappropriate. Acting on this advice, she returned to Pham's office the following week. As before, he touched her buttocks under her pants and underwear, and he also performed the "tapping rub" on her nipples and pubic region. When Toan asked Pham why he needed to touch her breasts, he did not say anything at first. It was only after she pressed for an answer that Pham said he was "looking for pain." After this session, Toan did not return to Pham's office. Instead, she began receiving treatment from a different chiropractor, to whom she revealed Pham's behavior. When this new chiropractor informed Toan she had heard similar things about Pham in the past, Toan went to the police.

## I

In order to be guilty of sexual battery by fraud, the perpetrator must touch an intimate part of the victim for sexual purposes and, at the time of the touching, the victim must be "unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose." (Pen. Code, § 243.4, subd. (c).) Although Pham does not dispute he touched Julie, Elsa and Toan inappropriately while examining them, he contends there is insufficient evidence they were not conscious of the sexual nature of the touching due to any fraudulent representations he made to them. We find sufficient evidence to support Pham's convictions for sexual battery by fraud.

In reviewing the sufficiency of the evidence to support a criminal conviction, we review the record " 'in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Stuedemann* (2007) 156 Cal.App.4th 1, 5 [67 Cal.Rptr.3d 13].) We

do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

"The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Traditionally, the law has distinguished between two types of fraud in analyzing the issue of consent in sex crime cases, fraud in the fact and fraud in the inducement. Fraud in the fact occurs when the defendant obtains the victim's consent to perform one act, but instead engages in another act. (*People v. Babaali* (2009) 171 Cal.App.4th 982, 987 [90 Cal.Rptr.3d 278]; see, e.g., *People v. Minkowski* (1962) 204 Cal.App.2d 832, 837–839 [23 Cal.Rptr. 92] [defendant gynecologist obtained permission to insert a medical instrument into victim's vagina but inserted his penis instead].) In that situation, consent is absent, and the defendant is guilty of sexual battery because the victim never agreed to the particular act complained of. (*People v. Babaali, supra*, 171 Cal.App.4th at p. 988.)

By contrast, fraud in the inducement takes place when the defendant makes misrepresentations to the victim in order to get her consent for a particular act, and then proceeds to carry out that very act. (*People v. Babaali, supra*, 171 Cal.App.4th at p. 987; see, e.g., *Boro v. Superior Court* (1985) 163 Cal.App.3d 1224 [210 Cal.Rptr. 122] [victim agreed to sexual intercourse because defendant falsely told her the act was necessary to treat a potentially fatal illness].) In that situation, courts have historically been reluctant to impose criminal liability on the defendant since the victim consented to the particular act performed, albeit under false pretenses. (*People v. Babaali*, at p. 987.)

However, in 2002, the Legislature sought to expand the circumstances under which a defendant may be prosecuted for fraudulently inducing a victim to consent to sexual conduct. Now, in addition to prohibiting fraud in the fact, California law proscribes "a narrow set of circumstances involving fraudulent inducement: those in which the victim was unaware of the nature

of the act due to the perpetrator's fraudulent representation that the sexual [assault] served a professional purpose." (*People v. Bautista* (2008) 163 Cal.App.4th 762, 773 [77 Cal.Rptr.3d 824].) The law was enacted "to close a loophole" that allowed defendants who committed sexual acts on their patients under the guise of medical treatment to escape punishment for their conduct. (Falk, *Rape by Fraud and Rape by Coercion* (1998) 64 Brook. L.Rev. 39, 112.) In that regard, the law represents a clear "legislative judgment[] that fraud and coercion are totally inappropriate in certain alliances between holders of positions of trust and their patients." (*Id.* at p. 101.)

■ Pham argues he did not commit sexual battery by fraud against any of his patients because he did not expressly tell them his touching of their intimate body parts was for professional, medical purposes. However, Pham did not have to deceive his patients in such explicit terms to be guilty of fraudulent representation under Penal Code section 243.4, subdivision (c). The statute does not require an express representation; it simply speaks to the situation where the defendant "fraudulently represented that the touching served a professional purpose." (*Ibid.*) In keeping with the statute's intent to criminalize sexual acts committed under the guise of professional services, it only makes sense to consider the totality of the defendant's conduct—not just his verbal statements—in determining whether he fraudulently represented the nature of his actions. After all, actions often speak louder than words: "A false promise can as easily, perhaps more easily, be implied from conduct as from language . . . ." (*Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1046 [135 Cal.Rptr.2d 736].)

■ We must also be mindful of the fact that, when it comes to treating their patients, physicians occupy a position of implicit trust. A medical professional "who holds him or herself out to the public as one available to administer to the medical needs of patients through examination and treatment is burdened with the duty to act for medical purposes in dealing with patients seeking medical care. There is an inherent trust and confidence which a patient seeking medical care places in the [professional] and upon which a patient relies in allowing the [professional] access to the most intimate parts of the body." (*State v. Tizard* (Tenn.Crim.App. 1994) 897 S.W.2d 732, 742–743.)

In *Tizard*, a doctor was convicted of sexual battery by fraud for fondling the victim's penis and masturbating him over the course of various steroid treatments. (*State v. Tizard, supra,* 897 S.W.2d at pp. 736–737.) Although the doctor never told the victim "why he did what he did" and never expressly indicated the inappropriate touching was for medical purposes (*id.* at p. 737), the court found there was sufficient evidence to support his convictions. Reasoning that "consent is not effective when it is induced by deception," the

court stated, "the evidence in this case shows that the defendant used his position as a treating physician with the intent to touch the victim's genitals solely for his sexual arousal or gratification, not for medical purposes, and that the touching was accomplished under the guise of medical examination and treatment for the purpose of having the victim allow such touching." (*Id.* at p. 742.)[2]

Likewise here, it readily appears Pham used his position as a medical professional in order to disguise his lewd intentions and perpetrate crimes. Julie, Elsa and Toan all came to him with the expectation of receiving medical treatment for their various injuries. When they arrived at his office, they signed in and had their vital signs checked, as would be expected in a medical setting. They understood Pham would be touching and moving their bodies in various ways to diagnose and treat their injuries. In fact, they all signed consent forms which explained their treatments might be uncomfortable. This signaled that Pham's techniques, even those that might be unsettling and anxiety producing, were a necessary part of their treatment regimens. Pham did nothing to dispel this message. Instead, he used it as a smokescreen to obscure his true intentions.

With respect to Julie, he waited until her third treating session to commence any wrongdoing. That way, she had the experience of two normal visits on which to base her trust in Pham as a genuinely concerned medical professional. Even on that third occasion, Pham did not immediately signal his true intentions. Instead, he began treating Julie by massaging and adjusting her neck. Then he worked his way down her chest until he was massaging her breasts. And when he finally slid his hands underneath her clothing, his fondling was not overtly sexual. Rather, he felt his way around the breast, as if he were conducting a normal breast exam. In so doing, Pham continued to give the appearance his actions were medically related. There is no evidence he displayed anything but a professional demeanor during this or any of the other exams at issue.

Unlike Julie, Elsa only saw Pham one time in his office. On that occasion, an assistant was present, and Pham checked Elsa's blood pressure and reflexes before having her lie down on the exam table. He also placed towels on her chest and waist, for the ostensible purpose of giving her privacy. However, while he was holding his stethoscope on her chest, he proceeded to slide his hand under her bra and touch her breasts. Once again, the touching was not overtly sexual in nature. Rather, he palpated Elsa's breasts, pressing down and moving his hand in a circular motion, spending only a few seconds

---

[2] While the *Tizard* court found sufficient evidence to uphold the defendant's convictions for sexual battery by fraud, it ultimately reversed the judgment against him because of evidentiary error that occurred during his trial. (*State v. Tizard, supra*, 897 S.W.2d at pp. 743–749.)

on each breast. And while he was doing this, he asked Elsa questions about the accident that caused her injuries. These circumstances strongly suggest Pham was doing his best to give the appearance his "treatment" of Elsa was designed to serve a professional purpose.

Likewise with Toan. Pham did not start taking advantage of her until she signed a consent form allowing him to touch her chest for purposes of treating her collarbone. When he did touch her breasts and pubic region, he did so with a "tapping rub" and "patting" motion, which gave the impression the touching was medically related. And even the manner in which Pham touched Toan's buttocks left her with the impression he was merely trying to "adjust" that area of her body. Then, when Toan confronted him about his conduct, he told her he was just checking for pain.

All told, there is sufficient evidence from which the jury could reasonably conclude Pham fraudulently represented to each of the victims that his inappropriate touching served a professional purpose. Even without an express representation to this effect, the totality of the circumstances provides ample evidence of this requirement. We therefore turn our attention to the additional requirement that Pham's fraud resulted in the victims being unconscious of the nature of his acts. (Pen. Code, § 243.4, subd. (c).)

The unconsciousness requirement does not require proof the victim was totally and physically unconscious during the acts in question. (*People v. Ogunmola* (1987) 193 Cal.App.3d 274, 279 [238 Cal.Rptr. 300].) It simply requires proof the defendant tricked the victim into submitting to the touching on the pretext it served a professional purpose. (*People v. Babaali, supra*, 171 Cal.App.4th at p. 996.) This can be accomplished even when the victim has agreed to the act in question. (*Ibid.*) So long as the victim was unaware of the "essential characteristics of the act," i.e., the sexual nature of the act itself, the unconsciousness requirement will be satisfied. (*Id.* at p. 998.)

From the facts on hand, it is abundantly clear Julie was unaware of the "essential characteristics" of Pham's acts at the time they occurred in 2003. She was 13. She testified she believed the intimate touching was simply part of the procedures to which she had consented. And it was not until two years after her treatment, when she volunteered in his office, that she began to suspect Pham of wrongdoing. Based on his kissing and coming on to her at that time, she began to question the treatment he rendered to her back in 2003. Even then, she was not entirely certain Pham had touched her in an inappropriate manner. Based on this evidence, the jury could easily conclude Pham's fraudulent representations rendered Julie unconscious of the sexual nature of his acts.

Elsa, 11 years older than Julie, had a different reaction to Pham's conduct. Describing her feelings when Pham touched her breasts, she testified she felt "instant shock" and was "automatically very scared." While this shows she did not expect Pham to touch her breasts, it does not necessarily prove she was aware of his sexual intentions at the time. In fact, she testified she was not sure what was happening at that moment. She obviously became very uncomfortable after the touching, but that could simply have been a visceral reaction to the touching itself. Her immediate reaction does not compel the conclusion she possessed a true understanding of the sexual nature of Pham's conduct.

The truth is, Elsa did not try to end the exam after Pham touched her breasts. Nor did she say anything to the assistant who was present when the touching occurred. Even after the exam was over and Pham left the room, she did not say a word to anyone in Pham's office. And she put off going to the police for several days after that. Although it is never easy for anyone to accuse a person in a position of power or authority of wrongdoing, Elsa's delay in reporting Pham's conduct does reflect a certain degree of uncertainty in her mind as to what Pham's intentions were. And, it seems clear that the context of the touching could very well have contributed to that uncertainty. Indeed, Pham's status as a medical provider, his professional demeanor, and the presence of an assistant during Elsa's exam all created the impression his actions were professionally, not sexually, motivated. Given all the circumstances surrounding the incident, the jury could reasonably find Elsa was unconscious of the sexual nature of Pham's acts at the time they were occurring.

Toan's unawareness of the essential nature of Pham's conduct is also reflected in the record. She signed a consent form permitting Pham to touch her chest area, and when Pham reached under her pants and touched her bare posterior, she believed he was trying to "adjust" her buttocks. While the touching made her somewhat uncomfortable, she did not jump to any conclusions about the matter. As a matter of fact, she did not say anything to Pham at the time, nor did she go directly to the police. Instead, she discussed the matter with family, friends and an attorney. And at the attorney's suggestion, she ended up going back to Pham for further treatment. Her willingness to return to Pham's office suggests she was not fully cognizant of the essential characteristics of the acts that Pham performed on her.

During this return visit, Toan questioned Pham when he touched her breasts. When he said he was checking for pain, she did not question his explanation, seek to end the exam or report his conduct to the authorities. It was only after Toan's new chiropractor informed her about Pham's reputation that she finally reported Pham to the police. This indicates that while Toan

came to be increasingly suspicious of Pham's conduct over time, she was not truly aware of the essential nature of his acts at the time he carried them out.

As with Julie and Elsa, we therefore conclude there is sufficient evidence from which the jury could find that Toan was unconscious of Pham's sexual intentions at the time he treated her. And because, as explained above, the evidence also shows the victims' unconsciousness was attributable to Pham's fraudulent representations—both implied and actual—we have no occasion to disturb his convictions. There is substantial evidence to support the jury's finding he committed sexual battery by fraud.

## II

The trial court sentenced Pham to seven years in prison, including the upper term of four years on count three. The court believed the upper term was justified because, in victimizing Julie, Pham took advantage of a position of trust. Pham does not dispute this finding, in and of itself, but he does challenge the trial court's authority to make it in the first place. He contends this was a jury call, and under the Sixth Amendment, he was entitled to have a jury of his peers—rather than the trial judge—decide whether any aggravating factors were present in his case.

Pham's claim is premised on an outdated view of California's sentencing law. When Pham committed his crimes, Penal Code section 1170, subdivision (b) made the midterm sentence the presumptive sentencing choice for his offenses; it was the maximum allowable punishment that could be imposed by virtue of the jury's verdict, absent additional aggravating circumstances. And at that time, it was customary for the trial court to determine the presence or absence of aggravating circumstances. However, in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], the United States Supreme Court determined such judicial factfinding violated the Sixth Amendment. The court ruled that, other than the fact of a prior conviction, " '[a]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum [i.e., the middle term under then-existing California law] must be submitted to a jury, and proved beyond a reasonable doubt.' " (*Cunningham*, at p. 291, fn. 14, italics omitted, quoting *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348].)

■ In response to *Cunningham*, the California Legislature did away with the midterm presumption, and now trial courts are free to impose an upper term sentence without engaging in additional factfinding. (Pen. Code, § 1170, subd. (b) ["When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."].) Because of this, criminal

defendants are no longer entitled to a jury trial on the issue of aggravating circumstances. (*People v. Sandoval* (2007) 41 Cal.4th 825, 843–858 [62 Cal.Rptr.3d 588, 161 P.3d 1146].)

For purposes of this appeal, it is significant that this change went into effect on March 30, 2007 (*People v. Sandoval, supra*, 41 Cal.4th at p. 836, fn. 2), and Pham was not sentenced until over a year later, on August 8, 2008. Therefore, he has no basis for complaining about the imposition of the upper term on count three. Given that the midterm was no longer the presumptive term at the time he was sentenced, the trial court was entitled to impose the upper term based on its own assessment of potential aggravating circumstances. This sentencing procedure did not violate Pham's right to a jury trial under the Sixth Amendment. (*People v. Wilson* (2008) 164 Cal.App.4th 988 [79 Cal.Rptr.3d 631] [recognizing the Legislature's amendment to Pen. Code, § 1170 cured the constitutional problem addressed in *Cunningham*].)

## DISPOSITION

The judgment is affirmed.

Aronson, J., and Fybel, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 30, 2010, S179301.