Filed 3/8/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HEATH JACOB SOMMER<br><br>    Defendant and Appellant. | A158234<br><br><br>(Solano County<br>Super. Ct. No. FCR337362) |

    Heath Jacob Sommer—a psychologist at a mental health clinic on a military base—sexually assaulted three patients under the guise of using "exposure therapy." A jury convicted Sommer of several felonies, including sexual battery by fraudulent representation (Pen. Code, § 243.4, subd. (c)),[1] and the trial court sentenced him to state prison.

    Sommer appeals. He contends: (1) insufficient evidence supports the sexual battery by fraud conviction; (2) the prosecutor misstated the law during closing argument; (3) the court erred by instructing the jury with

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the following portions of the Discussion: Section II (No Prosecutorial Error During Closing Argument); Section III (No Error in Instructing the Jury with CALCRIM No. 1191B); and Section IV (No Error in Declining to Release Portions of the Victims' Medical Records).

[1] Undesignated statutory references are to the Penal Code.

1

CALCRIM No. 1191B, regarding consideration of charged sex offenses; and (4) the court erred by refusing to release portions of the victims' sealed mental health records.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The prosecution charged Sommer with oral copulation by fraudulent representation (former § 288a, subd. (f), count 1); rape by fraudulent representation (§ 261, subd. (a)(4)(D), counts 2 and 3); sexual battery by fraudulent representation (§ 243.4, subd. (c), count 4); and sexual battery (§ 243.4, subd. (e)(1), counts 5 through 7).

### A. Sommer Sexually Assaults Three Patients

Sommer worked as a psychologist at a mental health clinic on a military base in Fairfield (base). From 2014 to 2016, he treated numerous patients at the clinic, including three female service members: I.P., Jeanne M., and Tiffany S.

#### 1. I.P.

When I.P. told Sommer she had been sexually assaulted twice, Sommer suggested "exposure therapy" to desensitize I.P. from the trauma associated with the assaults. During one session, Sommer asked I.P. to "perform fellatio on him . . . [as] part of [the] exposure therapy." Afterward, I.P. wondered why Sommer asked her to perform oral sex, as neither of her prior sexual assaults involved that act. I.P. realized the sex act was not therapy, but instead was for Sommer's "gratification."

At another session, Sommer offered to perform oral sex on I.P., but she declined. Soon after, Sommer stopped treating I.P. as there was "nothing more that he could do" for her. I.P. felt grateful to Sommer because he helped

2

her obtain a medical retirement from the military, but she also felt "deceived" by him.

    2.    Jeanne M.

During a therapy session, Jeanne told Sommer she had been raped while serving abroad; in response Sommer suggested Jeanne spend time with his family, to foster human connection. Jeanne agreed and visited Sommer's residence on several occasions for "home sessions." During these sessions, Sommer used "exposure therapy" to help Jeanne process the "traumatic experience" of being raped.

At one home session, Sommer told Jeanne she needed to understand that "not all . . . sexual contact is bad." He discussed having sex with Jeanne "in terms of exposure therapy," to help her learn to feel "safe." Jeanne agreed and had sexual intercourse with Sommer; she trusted Sommer and believed the therapeutic exercise would be effective. Afterward, however, Jeanne was "[s]uper confused." Jeanne continued having home sessions with Sommer until she was transferred to another base.

    3.    Tiffany S.

Tiffany attended about 30 therapy sessions with Sommer. At their first session, Tiffany told Sommer she had been sexually assaulted as a teenager. In response, Sommer said another patient had " 'come into his office and taken off her shirt and rubbed her breasts on him.' " Tiffany thought Sommer's comment was "strange" and wondered what it "had to do with [her]." At the end of the session, Sommer forced Tiffany to hug him goodbye. This made Tiffany uncomfortable because she did not like to be touched, and Sommer knew it.

Sommer suggested exposure therapy as a way to " 'work through' " the trauma of the sexual assault. As Sommer explained it, by "reliving" the prior

trauma, Tiffany would "become desensitized" to it. Sommer diagnosed Tiffany with personality disorder and predicted she "would commit suicide" if she did not accept the help he offered. This information—which came from a medical professional—convinced Tiffany she needed to participate in exposure therapy. Sommer began the "therapy" by touching Tiffany's shoulder or leg. When Tiffany expressed discomfort, Sommer told her to " 'work through it as part of the therapy.' "

Tiffany had previously been in therapy. She had never "questioned" a therapist's behavior—she assumed the therapist was providing appropriate treatment. Although Tiffany thought Sommer's techniques were "unorthodox," she continued the sessions because she believed she might be at risk of suicide without the therapy, and because she worried her personality disorder diagnosis could harm her career. Tiffany was "confused" about the physical aspect of the therapy: she did not think it was "normal" but Sommer represented that it was exposure therapy. Tiffany felt manipulated by Sommer.

At one session, Sommer asked Tiffany to show him something "personal" on her body. She resisted, but eventually showed Sommer part of her tattoo. At other sessions, Sommer touched Tiffany's breasts "down through [her] shirt," touched her vagina through her clothes, and put his lips close to her neck. Sommer also tried to bite Tiffany's nipples through her shirt. Another time, Sommer held Tiffany's hips and pulled her body into his. Tiffany was uncomfortable, but she believed the touching was "part of the exposure therapy."

During other sessions, Sommer "rubbed himself" against Tiffany and made her touch his erect penis. She tried to pull her hand away, but he forced it to remain there, reassuring her it was " 'okay' " and that he was

4

" 'safe,' " and urging her to " 'work through it.' " Tiffany interpreted these comments to mean the touching was an aspect of exposure therapy, but she felt uncomfortable and confused. It was not until Tiffany saw Sommer getting an erection that she fully realized the touching was for Sommer's sexual gratification.

Tiffany eventually reduced the frequency of her sessions with Sommer. Later, Sommer moved to a different job within the clinic.

## B. Additional Prosecution Evidence

Psychologist Dr. William Brim described exposure therapy, a method of treatment where patients discuss a traumatic event or perform an anxiety-provoking action until the memory or action no longer upsets them. Dr. Brim also described the therapist-patient relationship and testified sexual activity between a therapist and patient harms the patient, never serves a professional purpose, and is "inconsistent" with a therapist's code of conduct. "[S]exual contacts" between a patient and therapist leave the patient feeling "conflicted." As Dr. Brim explained: "[o]n the one hand, [patients] want to report it; on the other hand, they don't want to harm the therapist. Or maybe the therapist told them that this is a part of the treatment, and so they're not sure if it was wrong."

Two former patients testified Sommer touched them in a sexual manner and spoke to them using romantic language during therapy.[2] Sommer suggested the touching was a therapeutic exercise designed to help

---

[2] The testimony was admitted pursuant to Evidence Code section 1101, subdivision (b) after the court considered—and rejected—defense counsel's Evidence Code section 352 argument. The court excluded other uncharged acts as "cumulative . . . given that there are three complaining witnesses who have testified about specific acts that are actually charged."

the women learn to be comfortable with intimacy and closeness. Both women felt uncomfortable with—and confused by—Sommer's behavior.

## C. Verdict and Sentence

The jury convicted Sommer of all charges except count 3. The court sentenced Sommer to 11 years in state prison.

DISCUSSION

## I. Sufficient Evidence of Sexual Battery by Fraud

Sommer contends the conviction for count 4, sexual battery by fraudulent representation, must be reversed because there is insufficient evidence Tiffany was "unconscious" of the sexual nature of Sommer's act of touching her breast. We disagree.

A conviction for sexual battery by fraud in violation of section 243.4, subdivision (c) requires the prosecution to prove the victim is " 'unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose.' " (*People v. Pham* (2009) 180 Cal.App.4th 919, 924 (*Pham*).) The prosecution must establish "the defendant tricked the victim into submitting to the touching on the pretext it served a professional purpose. [Citation.] This can be accomplished even when the victim has agreed to the act in question. [Citation.] So long as the victim was unaware of the 'essential characteristics of the act,' i.e., the sexual nature of the act itself, the unconsciousness requirement will be satisfied." (*Id.* at p. 928.)

The "unconsciousness of the sexual nature of the act" need not "be absolute. Confusion, rather than clarity, is not surprising when a professional unexpectedly touches the sexual parts of the victim's body during purported professional treatment. Confusion or doubt about the purpose of the touching does not preclude a conviction as long as the jury

6

finds beyond a reasonable doubt that the victim allowed the touching to occur because of the defendant's fraudulent misrepresentation of a professional purpose." (*People v. Icke* (2017) 9 Cal.App.5th 138, 149 (*Icke*).)

"In reviewing the sufficiency of the evidence to support a criminal conviction, we review the record ' "in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]' We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*Pham, supra,* 180 Cal.App.4th at pp. 924–925.)

Here, substantial evidence supports the jury's finding that Sommer tricked Tiffany into allowing him to touch her breasts on the pretext it served a professional purpose, e.g., that it was part of her exposure therapy. Using his position as a medical professional, and leveraging Tiffany's trust of psychologists, Sommer convinced Tiffany that her life—and her career— would be at risk if she did not agree to the exposure therapy. Tiffany thought Sommer's techniques were unorthodox and she questioned whether the touching was appropriate, but she allowed it because Sommer manipulated her into thinking it was therapeutic. (*Pham, supra,* 180 Cal.App.4th at p. 927 [defendant's conduct signaled that his techniques, while "unsettling and anxiety producing, were a necessary part of . . . treatment"].) It was not until several months into the therapy—when Tiffany noticed Sommer's erect penis—that she fully realized he was achieving sexual gratification.

From this evidence, the jury could easily conclude Sommer's fraudulent representations rendered Tiffany unconscious of the sexual nature of his act

of touching her breast. (*Pham, supra,* 180 Cal.App.4th at pp. 922, 924 [substantial evidence victims were unconscious of the sexual nature of the defendant's touching]; *Icke, supra,* 9 Cal.App.5th at p. 149 [evidence supported jury's finding that the defendant touched victim "with a sexual purpose, but falsely led her to believe he did so accidentally while acting with a professional purpose"]; *People v. Bautista* (2008) 163 Cal.App.4th 762, 779–781 [sufficient evidence supported finding that victim was misled about the purpose of the defendant's actions].)

Sommer's attempt to reconstruct the timeline to suggest Tiffany "knew" he "was not practicing true exposure therapy" is not persuasive. In finding Sommer guilty, the jury concluded Sommer tricked Tiffany into allowing him to touch her breast on the pretext it served a professional purpose. As this finding has ample evidentiary support, "it is not the province of this court to question it." (*People v. Bautista, supra,* 163 Cal.App.4th at p. 781; *Pham, supra,* 180 Cal.App.4th at p. 925.)

## II. *No Prosecutorial Error During Closing Argument*

Sommer contends the prosecutor misstated the law during rebuttal argument when he told the jury " 'confusion is unconsciousness.' " We use the term "prosecutorial error" rather than "prosecutorial misconduct" (*People v. Centeno* (2014) 60 Cal.4th 659, 667, 674 (*Centeno*)) and conclude the prosecutor did not err.

A.     Background

During closing argument, the prosecutor defined "unconscious" as "not aware of the essential characteristics of the act because the perpetrator fraudulently represented that the [sex act] served a professional purpose and it served no . . . purpose." The prosecutor explained the unconsciousness does "not have to be absolute" and that the victims did not "have to be one

8

hundred percent tricked or fooled into thinking that it's for a professional purpose. If they're confused, if they're not sure, to deal with that confusion, that uncertainty that this is for a professional purpose that [ ] is represented to them, that they submit to these acts, that's enough. They don't have to be absolutely one hundred percent sure that this was for their therapy."

In his closing, defense counsel argued that, as to I.P., "[t]here was no confusion." Regarding the other victims, counsel argued the sex acts did not occur, were consensual, or were performed knowing they were for Sommer's sexual gratification. Counsel also suggested the victims were not credible.

In rebuttal, the prosecutor countered that Tiffany did not fabricate her testimony. The prosecutor reminded the jury that Tiffany was "confused" because Sommer convinced her the "touching was for her therapy. And she was confused about it. [¶] And . . . remember from the jury instructions, you do not have to be one hundred percent unconscious, one hundred percent certain that you were unaware of the nature of the sexual act. Confusion is unconsciousness."

Defense counsel objected that the prosecutor misstated the law. The court overruled the objection. It concluded the prosecutor had "fairly commented on the evidence, not the law." Later, outside the presence of the jury, defense counsel requested permission to make surrebuttal closing to address the prosecutor's statement that "confusion or doubt is sufficient." The court denied the request. It determined the statement was a "fair comment on the evidence" and noted a victim's awareness of the sexual nature of the act was a factual issue for the jury.

B. The Prosecutor Did Not Misstate the Law During Rebuttal Argument

"[P]rosecutors have wide latitude to present vigorous arguments so long as they are a fair comment on the evidence, including reasonable inferences

9

and deductions from it." (*People v. Leon* (2015) 61 Cal.4th 569, 606.) But " 'it is improper for the prosecutor to misstate the law generally, and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements.' " (*Centeno, supra,* 60 Cal.4th at p. 666.) A prosecutor's behavior violates the federal Constitution " 'when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial [error] under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade . . . the jury.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions,' [citation] there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Centeno, supra,* 60 Cal.4th at p. 667.)

A victim's lack of awareness of the sexual nature of the act is an element of the crimes at issue. (*Pham, supra,* 180 Cal.App.4th at p. 928; *People v. Robinson* (2016) 63 Cal.4th 200, 208.) As stated above, the lack of awareness need not be absolute: "Confusion or doubt about the purpose of the touching does not preclude a conviction as long as the jury finds beyond a reasonable doubt that the victim allowed the touching to occur because of the defendant's fraudulent misrepresentation of a professional purpose." (*Icke, supra,* 9 Cal.App.5th at p. 149.)

In rebuttal, the prosecution responded to defense counsel's argument that "there was no confusion" by reminding the jury that Tiffany testified she

10

was "confused" by Sommer's act of touching her breast because Sommer convinced Tiffany the "touching was for her therapy." Referencing the jury instructions the jury would later receive, the prosecutor stated: "you do not have to be one hundred percent unconscious, one hundred percent certain that you were unaware of the nature of the sexual act. Confusion is unconsciousness." By pointing out Tiffany's confusion about whether the act was for her therapy and urging the jury to conclude Tiffany was unaware of the sexual nature of the act, the prosecutor was not giving the jury an erroneous definition of unconsciousness but making a factual argument premised on evidence in the record. (*Icke, supra*, 9 Cal.App.5th at p. 149.)

There is no indication the jury understood or applied the prosecutor's comment in an improper or erroneous manner. (*Centeno, supra,* 60 Cal.4th at p. 667.) When the court overruled defense counsel's objection, it noted the prosecutor had "commented on the evidence, *not the law*." (Italics added.) Even assuming the jury interpreted the prosecutor's comment as stating a legal definition, the court directed the jury to follow the jury instructions, not the "attorneys' comments on the law."[3]

Sommer's reliance on *People v. Hill* (1998) 17 Cal.4th 800, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, is misplaced. There, the prosecutor committed "serious, blatant and continuous misconduct" by—among other things—misstating the law several times during closing argument. (*Id.* at pp. 844, 829–832.) In one instance, the prosecutor omitted the force or fear element of robbery, which undermined the "defendant's primary defense." (*Id.* at p. 831.) The California Supreme Court concluded the prosecutor's "pervasive campaign to

---

[3] Sommer does not challenge the prosecutor's reference to the victims' "confusion" at the outset of closing argument and he does not contend the instructions on the offenses were incorrect.

11

mislead the jury on key legal points," when combined with numerous other errors, including instructional error, required reversal. (*Id.* at pp. 846–847.) This case bears no resemblance to *Hill*. There was no "pervasive campaign" of misinformation here, only a brief comment on the evidence.

As we conclude the prosecutor did not misstate the law during rebuttal argument, we do not address Sommer's claims that the court erred by denying his request for surrebuttal argument, nor his contention that the errors were prejudicial.

## III. *No Error in Instructing the Jury with CALCRIM No. 1191B*

Sommer claims the court erred by instructing the jury with CALCRIM No. 1191B.

That instruction provides: "The People presented evidence that [Sommer] committed the crimes of oral copulation by fraudulent representation as charged in Count 1, rape by fraudulent representation as charged in Counts 2 and 3, sexual battery by fraud as charged in Count 4, and sexual battery as charged in Counts 5 through 7. ¶ If the People have proved beyond a reasonable doubt that [Sommer] committed one or more of these crimes, you may, but are not required to, conclude from that evidence that [Sommer] was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that [Sommer] was likely to commit and did commit the other sex offenses charged in this case. ¶ If you find that [Sommer] committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that [Sommer] is guilty of another crime. The People must still prove each charge beyond a reasonable doubt."

Sommer contends the instruction violates state and federal law by allowing jurors to rely on a charged offense to find he "had a propensity to

12

commit sexual offenses and was therefore guilty of all charges." As Sommer acknowledges, this claim is foreclosed by *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*). There, our high court held an instruction similar to the one at issue here did not violate the defendant's due process rights or impermissibly lower the standard of proof. (*Id.* at pp. 1167–1168.) We are bound by the Supreme Court's opinion. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We join the other appellate decisions following *Villatoro* and conclude the trial court properly instructed the jury with CALCRIM No. 1191B. (See *People v. Meneses* (2019) 41 Cal.App.5th 63, 67–68; *People v. Phea* (2018) 29 Cal.App.5th 583, 608; *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1103–1104.)

Nor are we persuaded by Sommer's claim that the court failed to conduct an Evidence Code section 352 analysis before instructing the jury. Before it admitted evidence of uncharged prior acts, the court considered defense counsel's Evidence Code section 352 argument. Thus, the "court implicitly conducted an [Evidence Code] section 352 analysis" regarding the charged acts before giving the instruction. (*Villatoro, supra,* 54 Cal.4th at p. 1168; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 829 [rejecting similar claim].)

**IV. *No Error in Declining to Release Portions of the Victims' Medical Records***

Sommer contends the court erred by declining to release portions of the victims' sealed medical records because those documents may have "assisted counsel in cross-examining the witnesses or developing . . . impeaching or exculpatory evidence." Sommer does not contend the court's ruling violated his federal constitutional rights.

Defense counsel subpoenaed the victims' medical records and the base

13

sent them to the court for an in camera review. One of the documents defense counsel requested was Tiffany's personal health questionnaire (PHQ). Counsel argued the PHQ was relevant to show Sommer's therapy was helping Tiffany. The court conducted an in camera hearing, after which it ordered the disclosure of numerous documents, but not the PHQ. It noted "no separate PHQ documents were . . . produced," that "nothing like that" was "filled out by [Tiffany]," and that the PHQ was "not yet relevant." Later, the court received the PHQ for Tiffany. It asked the parties whether they "wish[ed] to make any further record" and they declined.

The court held a separate in camera hearing pertaining to medical records for Jeanne. After the hearing, the court disclosed some, but not all, of Jeanne's medical records. It noted that the additional documents requested by defense counsel "appear[ed] to just mimic what's already in the records being disclosed."

"This court's function is to review the confidential records that the . . . court declined to disclose, in order to determine whether they were material and should have been disclosed. [Citation.] . . . ' "[Evidence] is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." ' [Citation.] We also consider the effect of nondisclosure on the investigations conducted by [defense] counsel and on counsel's trial strategy." (*People v. Martinez* (2009) 47 Cal.4th 399, 453–454.)

We have reviewed the records and the in camera hearing transcripts. We conclude the undisclosed information "was not material to the defense." (*People v. Martinez, supra,* 47 Cal.4th at p. 454; *People v. Abel* (2012) 53 Cal.4th 891, 931 [prosecution witness's psychiatric records were not material

14

and did not implicate "the preparation or presentation of defendant's case"]; *People v. Gurule* (2002) 28 Cal.4th 557, 591–592 [no prejudicial error in declining to provide defendant with "full access" to victim's psychiatric records].)  The court did not err by declining to disclose the records.

## DISPOSITION

The judgment is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Wiseman, J.*


*People v. Sommer*/A158234

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16

Trial Court:        Solano County Superior Court

Trial Judge:       Hon. E. Bradley Nelson

Counsel:           Office of Attorney General, Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney general, Jeffrey M. Laurence, Senior Assistant Attorney General, Lisa Ashely Ott, Deputy Attorney General, Arthur P. Beever, Deputy Attorney General, for Plaintiff and Respondent.

First District Appellate Project, Cliff Gardner and Daniel Buffington, for Defendant and Appellant.