Filed 6/10/24  P. v. Stilley CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C098458 |
| Plaintiff and Respondent, | (Super. Ct. No. S-CR-0001364A) |
| v. | |
| RANDY JAMES STILLEY, | |
| Defendant and Appellant. | |

In 1995, a jury found defendant Randy James Stilley guilty of first degree murder and the trial court sentenced him to 50 years to life imprisonment.  In 2021, Stilley petitioned for resentencing pursuant to Penal Code section 1172.6,[1] arguing that he could no longer be convicted of first degree murder.  The parties agreed Stilley had established

---

**1**     Undesignated statutory references are to the Penal Code.  Stilley filed his resentencing petition under former section 1170.95.  Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6, with no relevant change.  (Stats. 2022, ch. 58, § 10.)  For ease of exposition, we will cite to the current section 1172.6 throughout this opinion.

a prima facie case for relief, and the trial court held a hearing to determine whether to vacate the murder conviction. The court concluded Stilley was still guilty of first degree murder as a direct aider and abettor. On appeal, Stilley argues the trial court erred in its decision because there was no substantial evidence he aided and abetted the murder. Finding no merit in this contention, we affirm the postconviction order denying the section 1172.6 petition.

## BACKGROUND

### I

### *Jury Trial Proceedings*

In 1994, the People charged Stilley, along with codefendant Rory Clay, with first degree murder (§ 187, subd. (a)). At trial, the People introduced evidence that the victim in this case was managing the Delta Breeze Hotel around the time he was killed. Because the hotel was in "total shambles," Susan E. was brought on to take over management. On June 6, 1994, while removing car parts stored in the laundry room, Susan E. was confronted by Clay (a frequent visitor of the hotel) who claimed the parts were his. The next day, Clay confronted Susan E. again to ask what she was doing with his stuff and where the victim was. He then said, "Tell that motherfucker I'm going to kill him." That night, Clay called Susan E. at her home and demanded to know where "his stuff" and the victim were. When Susan E. told him that everything she took out had been put in the dumpster, he threatened to get a machine gun and spray her house.

According to Stilley's uncle, Donnie Stilley,[2] on June 10, Stilley called him between 1:00 a.m. and 1:30 a.m. Stilley said he was coming to Donnie's home, which is in a rural area of Auburn more than 30 miles from where Stilley lived and the Delta Breeze Hotel. Stilley arrived in the victim's red Camaro with Clay and the victim.

---

[2]     Because Randy James Stilley and Donnie Stilley have the same last name, we will refer to Donnie by his first name. No disrespect is intended.

Stilley was wearing blue jeans and Clay was wearing black Levi's. Donnie had met Clay on several prior occasions at Stilley's home, but Donnie was not socially acquainted with either Clay or the victim; neither of them had been to his home before. Donnie was thus surprised Stilley brought them to his home in the middle of the night and he did not know why Stilley had done so. All three visitors had been drinking and continued to drink after they arrived. Within an hour, Stilley, Clay, and the victim started arguing about personal property that had purportedly been stolen from a storage unit. The three visitors were visibly angry about the situation. Donnie eventually told them all to leave.

Stilley, Clay, and the victim got into the Camaro, with the victim in the driver's seat. After Donnie turned back toward the house, he heard the victim say something like, "Ow. Hey, knock it off," before the victim got out of the car and ran away. Stilley and Clay chased the victim, yelling that he was a "fucking liar." Once they caught him, Stilley and Clay began slapping, punching, and kicking the victim. Donnie ran over to find the victim curled up on the ground and told Stilley and Clay to stop. Stilley and Clay backed away.

While Donnie was kneeling over the victim and trying to get him up, a concrete cinder block came crashing down on the victim's head. The victim was wounded and knocked unconscious. Donnie looked up and saw Clay standing five feet away in the direction that the cinder block came from. Donnie also saw Stilley standing next to his porch, which was approximately 60 feet away. Donnie started screaming at both Stilley and Clay, asking what they were doing and why did they come to his house to do this. Donnie told them that the victim needed medical help. Donnie and Clay picked the victim up and carried him to the car. The victim was bleeding only "a small amount of blood" at this time, though he bled more as time passed.

When Donnie and Clay reached the Camaro, the locking mechanism for the hatchback had already been released. Donnie testified that he did not unlock the mechanism that would allow the hatchback to raise, and he did not recall Clay doing so

3

either.  Stilley was standing by the passenger door when the victim, who was still alive at this time, was placed in the car.  Clay drove the car away with Stilley in the passenger seat and the victim in the back.

An hour later, Stilley called Donnie and asked Donnie to meet him at an address in Rio Linda and to bring gasoline.  About one mile from his driveway, Donnie drove past several patrol cars and the victim's body lying beside the road.  Upon arriving at the address in Rio Linda, Donnie observed the victim's red Camaro in the driveway.  As Donnie got out of his car, Stilley and Clay came from the residence.  Donnie met with Stilley, Clay, and Michael Destfino, and Stilley asked Donnie to burn the Camaro.[3] Donnie and Destfino brought the car to a secluded levee where they burned it using gasoline.  After returning home, Donnie found a Taser that had been dropped near where the Camaro had been.

An autopsy concluded the victim's cause of death was multiple blunt force trauma.  There was significant blood loss where the victim's body was discovered.  There was also blood splatter spanning several feet from the victim's head, indicating that blunt force trauma had occurred at that location.  Abrasions, lacerations, and bone fractures primarily on the right side of the victim's head were consistent with a cinder block being dropped on him.  Lacerations and multiple bone fractures to the left side of the victim's head were consistent with the victim being struck multiple times with a club-like object, possibly a metal pipe.  The injuries to the right side of the victim's head would not cause immediate death and a person with such injuries would still be alive after being transported eight-tenths of a mile over a period of three to five minutes.  The victim also

---

[3]     At trial, Donnie testified he did not recall who first approached him about burning the Camaro.  But the prosecutor presented Donnie with a prior sworn statement to refresh his memory, after which Donnie testified it was Stilley who first asked him to help burn the car.

had puncture wounds on his back right shoulder consistent with the application of a Taser. There were also two holes in the back of the victim's shirt that were roughly the same distance apart as the prongs of the Taser Donnie found.

Police recovered the victim's burned Camaro. Investigators found a black pair of Levi's jeans and a blue pair of jeans, both stained with blood matching the victim's blood type, in the rear cargo area. The blue jeans specifically had large soaking-type bloodstains, meaning they had been in contact with a bloody object or body. The blue jeans were labeled with a waist size of 33 inches and a length of 33 inches, though they actually measured 33.5 inches at the waist and 28 inches in length. Investigators also found a bloodstained metal pipe in the Camaro. A clump of hair similar in color, length, and coarseness to the victim's hair was found on the passenger floorboard.

Stilley told police the night of the murder he was drinking by the Sacramento River. He gave police a pair of black jeans that he claimed to be wearing the night of the murder. Those jeans were labeled with a waist size of 36 inches and a length of 30 inches. After he was detained, Stilley saw Donnie and gestured "zip your lip[s]" to him.

In his defense, Clay testified that when he, Stilley, and the victim returned to the Camaro after visiting Donnie's home, Stilley shocked the victim with a Taser. According to Clay, the victim and Stilley exited the car, and Stilley tackled the victim and hit him with a cattle prod. Stilley and Donnie then dumped the victim's body in the back of the car. Stilley drove the Camaro a short distance down the road, pulled over, removed the victim's body, and returned to the car.

The jury found Stilley guilty of first degree murder. The trial court sentenced him to 25 years to life, doubled to 50 years to life due to a prior strike conviction. We affirmed the judgment on appeal. (See *People v. Clay, et al.* (Dec. 2, 1997, C020889) [nonpub. opn.].)

5

## II

### *Resentencing Petition*

In 2021, Stilley petitioned for resentencing pursuant to section 1172.6. The parties agreed Stilley had made a prima facie case for relief. The trial court ordered briefing and held a hearing to determine whether Stilley was entitled to relief. The parties submitted only the trial transcript as evidence.

The trial court ultimately concluded: "[T]he prosecution has proved that the petitioner is guilty of intentional first degree murder with premeditation and deliberation under California law. . . . [¶] Although the killing of [the victim] was not a well-thought-out plan, the evidence establishes beyond a reasonable doubt that [Stilley] aided and abetted Rory Clay in assaulting and killing the victim and that the petitioner did so with the intent to kill and with premeditation and deliberation." In support of its decision, the court explained that: (1) Clay's trial testimony was not credible and should be disregarded; (2) no legitimate reason was ever provided for Stilley bringing the victim to his uncle's rural home in the middle of the night; (3) after leaving Donnie's home and getting into the Camaro, Clay or Stilley (or both) attacked the victim with a Taser; (4) the victim was driven off the property, removed from the car, placed on the side of the road, and beaten to death with a metal pipe; (5) Stilley demonstrated consciousness of guilt by assisting in the destruction of material evidence, giving false statements to investigators, and indicating to Donnie to not talk about the crime; (6) either Stilley was wearing the bloody blue jeans found in the car or he was wearing a different pair of jeans that were never given to police or recovered; and (7) Stilley did not provide police with the actual pants he was wearing the night of the murder.

Stilley timely appealed.

## DISCUSSION

Stilley argues the trial court erred in denying his resentencing petition because there was no substantial evidence that he directly aided and abetted the murder.

6

We review the denial of a section 1172.6 petition for substantial evidence. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We examine " 'the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.)

" '[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Vargas* (2022) 84 Cal.App.5th 943, 953-954.)

The first element is not in dispute, as Stilley concedes "that substantial evidence supports the finding that [Clay] killed [the victim] by beating him in the head at least five or six times with a metal pipe after previously striking him in the head with a cinder block, likely because of a dispute . . . over certain personal property." But Stilley insists there is no substantial evidence he knew of Clay's intent to kill and shared in that intent

7

or that he did or said anything to aid, promote, encourage, or instigate the murder. We disagree on both counts.

"Proof of intent may be made by way of inferences from a defendant's volitional acts which are done with knowledge of the probable consequences, and presence at the scene of the crime, while insufficient of itself to make one an aider and abettor, is one factor which tends to show intent. Other factors which may be considered include the defendant's failure to take steps to prevent the commission of the crime, companionship, and conduct before and after the crime." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 892-893, superseded by statute on another ground as stated in *People v. Levesque* (1995) 35 Cal.App.4th 530, 536-537.)

These factors all support a finding of the requisite intent in this case. As the trial court recognized, Stilley brought Clay and the victim more than 30 miles out to his uncle's rural home in the middle of the night. His uncle did not know why Stilley brought them there and was surprised Stilley had done so. In light of what transpired, it can reasonably be inferred Stilley set up the visit for the purpose of killing the victim in a remote, private location. After the victim was tased (either by Stilley or by Clay in Stilley's presence), Stilley screamed at, chased down, and assaulted the victim. In Stilley's presence, Clay threw a concrete block on the victim's head, knocking the victim unconscious and seriously injuring him. To the extent there was any doubt as to Clay's intent to kill, this act made it entirely clear. Despite this, Stilley proceeded to drive with Clay to the roadside where the murder was completed. Afterwards, Stilley went to great lengths to destroy material evidence. Nothing in the record suggests Stilley was surprised by what occurred, and at no point did Stilley attempt to aid the victim, call for an ambulance, or otherwise prevent the murder. Considering all the evidence, it can reasonably be inferred Stilley knew Clay intended to kill the victim and shared in this intent.

There is also substantial evidence Stilley assisted in the murder in several respects. First, as discussed, a fact finder could reasonably infer Stilley set up the visit to the remote location so the victim could be killed there. Second, by chasing the victim from his car and assaulting him, Stilley caused the victim to curl up on the ground. Being in this vulnerable position is what permitted Clay to knock the victim unconscious, which rendered the victim defenseless. Third, it can reasonably be inferred that Stilley opened the hatchback so the victim could be loaded into the Camaro, as Donnie testified that neither he nor Clay opened it and Stilley was the only other person present.

Lastly, it can be inferred from the bloodstained blue jeans that Stilley aided or participated in the actual murder by the roadside. The evidence establishes Stilley was wearing blue jeans when the murder occurred. A fact finder could reasonably infer that the bloodstained blue jeans were Stilley's and that they got blood on them from aiding in the murder—for instance, by helping to carry the victim from the car to the side of the road. Stilley suggests that other contrary inferences could be drawn, such as that the jeans actually belonged to the victim, or that the jeans were bloodied after being thrown into the Camaro to burn. Given the deferential standard of review, we reject such inferences. (See *People v. Myles* (2023) 89 Cal.App.5th 711, 740 ["for purposes of substantial evidence review, we are not permitted to draw inferences contrary to the verdict"].) The clump of hair found in the Camaro near where Stilley was sitting lends further support to the inference that Stilley participated in the murder.

Having found that substantial evidence supports the trial court's conclusion, we reject Stilley's sufficiency of the evidence challenge.

**DISPOSITION**

The postconviction order denying Stilley's section 1172.6 petition is affirmed.


                                           /s/
                                   EARL, P. J.


We concur:


     /s/
KRAUSE, J.


     /s/
BOULWARE EURIE, J.